**In re PRUDENTIAL LINES, INC., Debtor.**

**PRUDENTIAL LINES, INC., Plaintiff,**

**v.**

**The UNITED STATES MARITIME ADMINISTRATION, United States Department of Transportation, Defendants.**

**Bankruptcy No. 86 B 11773.**
**Adv. No. 86–5865A.**

United States Bankruptcy Court,
S.D. New York.

Sept. 29, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by James L. Garrity, Jr., New York City, John Stemplewicz, U.S. Dept. of Justice, Washington, D.C., for defendants.

Stroock & Stroock & Lavan, New York City by Sheldon I. Hirshon, John B. Berringer, for debtor.

## DECISION & ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The United States Maritime Administration ("MarAd") and the United States Department of Transportation (collectively, the "Defendants") seek an order pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, Fed.R.Civ.P. 12(b), and Rule 7012 of the Rules of Bankruptcy Procedure, Fed.R.Bankr.Proc. 7012, dismissing the complaint (the "Complaint") filed by Prudential Lines, Inc. ("PLI" or the "Debtor"), the debtor-in-possession in this case under Chapter 11 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 1101 *et seq.* (1986). Defendants assert, *inter alia,* that the issues raised by the Complaint should be deferred to their contracting officer (the "Contracting Officer") and the Maritime Subsidy Board ("MSB") or the Court of Claims. We are thus requested to continue developing the roles of the bankruptcy court, agencies and a sister specialized court in the dispute resolution process. Here, moreover, that issue is complicated by sovereign immunity concerns.

## I.

In this adversary proceeding, the Complaint[1] seeks a judgment against the Defendants for: (i) "compensatory damages proximately caused by MarAd's precipitous, inequitable and unreasonable conduct which caused PLI to become the subject of an involuntary petition under Chapter 11 of the Bankruptcy Code," (ii) "compensatory damages, based on contract and tort theories, proximately caused by MarAd's breach of contract," (iii) "punitive

---

1. On this motion under Rule 12(b), where no affidavits have been submitted, all factual allegations of the complaint are to be presumed true and all reasonable inferences are to be made in favor of the nonmoving party. *Cf.*

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957); *Allard v. Smith (In re DeLorean Motor Co.),* 56 B.R. 936, 945 (Bankr.E.D.Mich.1986).

damages based on MarAd's precipitous, inequitable and unreasonable conduct," (iv) equitable subordination of MarAd's claim to all other allowed claims and a transfer of all liens securing MarAd's claim to PLI's estate, (v) "a permanent injunction against MarAd enjoining the foreclosure of its liens against" the LASH ATLANTICO, the LASH PACIFICO and the LASH ITALIA (collectively, "PLI's Vessels"), (vi) turnover of $2,877,352 (the "Withheld ODS Amount"), the amount of the operating differential subsidy ("ODS") owing to PLI but withheld by MarAd, (vii) "a declaratory judgment decreeing and adjudging that MarAd has no right of setoff against the Withheld ODS Amount," and (viii) "a declaratory judgment decreeing and adjudging that MarAd has no right of recoupment against the Withheld ODS Amount." Complaint ¶ 1.

In support of such relief, PLI alleges that it in conducting its business of providing U.S.-flag ocean liner service between the United States' east coast and various ports in the Mediterranean and Black Seas, PLI utilized its own vessel, the LASH ITALIA, and two chartered vessels, the LASH ATLANTICO and the LASH PACIFICO. Complaint ¶¶ 22–24. The construction of the LASH ITALIA was financed by PLI's issuance to third parties of shipbuilding bonds (the "ITALIA Title XI Debt") the payment of which was insured and guaranteed by MarAd pursuant to Title XI of the Merchant Marine Act ("Title XI"). Id. ¶ 98 The construction of the Chartered Vessels was also financed by the issuance of shipbuilding bonds (the "ATLANTICO and PACIFICO Title XI Bonds") which were insured and guaranteed by MarAd pursuant to Title XI. Id. ¶ 88. PLI was the bareboat charterer of the chartered vessels pursuant to certain bareboat charter parties, dated October 11, 1974, as amended between it and the United States Trust Company of New York, solely in its capacity as trustee under a trust agreement, dated October 11, 1974, with Union Minerals and Alloys Corp. as settlor. Id. ¶ 24.

It is further alleged that on or about December 28, 1977, PLI and MarAd entered into an agreement entitled Operating Differential Subsidy Agreement, No. MA/MSB–421 (the "ODS Contract"). The ODS Contract provides, inter alia, that MarAd is to make ODS payments to PLI in an amount determined by MarAd that is equal to the excess of the sum of subsidizable wage costs of PLI for United States officers and crews plus other operations costs over MarAd's estimate of the fair and reasonable costs of the same items of expense for foreign competitors. Id. ¶ 25. Additionally, the ODS Contract provides that the ODS is to be paid at a rate set by MarAd based on a crew compliment for PLI's Vessels of thirty-eight men with respect to PLI's Mediterranean/Black Sea service. Id. At the termination of each voyage, in accordance with the terms of the ODS Contract, PLI submitted subsidy vouchers to MarAd based upon the subsidy rate determined by MarAd which included the thirty-eight man crew compliment covered by the ODS contract. Id. ¶ 28.

Thereafter, PLI ran into financial difficulties. In addressing its problems, it, on or about September 17, 1982, obtained a concession from the National Maritime Union ("NMU"), one of the four sea-going unions supplying crewmen for PLI's Vessels. Pursuant thereto the crew compliment on PLI's Vessels involved in the Mediterranean/Black Sea service was temporarily reduced from thirty-eight men to thirty-three men (the five man difference is referred to as the "Crew Differential"). Id. ¶ 27. The concession was conditioned on PLI adhering to a negotiated payment schedule regarding amounts it owed to various NMU-sponsored benefit plans. Id. PLI failed to adhere to the payment schedule and, on or about January 6, 1984, the NMU withdrew the crew compliment concession but it never reassigned the additional five crewmen to each of PLI's Vessels. Id.

It is alleged that, except for certain sums withheld, MarAd made ODS payments to PLI based upon the thirty-eight man crew compliment covered by the ODS Contract notwithstanding PLI's reporting of and MarAd's awareness of the Crew Differential. Id. ¶¶ 28–29, 34–36.

In a further effort to work out its financial problems, PLI met with MarAd in September 1984 to negotiate the final amount of ODS payable to PLI for the subsidy years 1981 through 1984 and to resolve all issues between MarAd and PLI regarding ODS payable to PLI pursuant to the ODS Contract for said subsidy years. *Id.* ¶ 30. PLI alleges that, in order for PLI to receive the amount of ODS offered by MarAd, MarAd required PLI to (i) waive any claim PLI then had or might in the future have against MarAd with respect to asbestosis claims asserted against PLI by its crewmen, (ii) waive the right to seek additional ODS in the event actual costs exceed negotiated costs, (iii) accept an unfavorable base rate cycle to establish the ODS rate, and (iv) agree that the amount of offered ODS be discounted to present value. *Id.* ¶ 31. PLI objected to the unfavorable base rate cycle but MarAd took the position that it was fair in view of the Crew Differential. *Id.* ¶ 32. PLI and MarAd agreed upon a negotiated amount of ODS to be paid for the subsidy years 1981 through 1984 which recognized that PLI had the benefit of the Crew Differential. *Id.* ¶ 33.

It is further averred that in March 1985, MarAd submitted proposed subsidy wage rates for the subsidy year July 1, 1984 through June 30, 1985 based on a crew compliment of thirty-eight men to PLI despite MarAd's awareness of the Crew Differential. *Id.* ¶ 37. PLI objected to certain components of MarAd's computation and after further negotiations MarAd and PLI agreed upon a subsidy wage rate in excess of the rate originally proposed by MarAd. *Id.*

In March 1986, MarAd submitted proposed subsidy wage rates for the subsidy year July 1, 1985 through June 30, 1986, again based on a crew compliment of thirty-eight men, to PLI. *Id.* ¶ 38. When these proposed rates were under review and negotiation, however, PLI's Vessels were arrested and thus the rates were never actually agreed upon. *Id.*

In May 1986, various creditors threatened to arrest PLI's Vessels. *Id.* ¶ 47.

PLI asserts that it negotiated with each such creditor in order to prevent the threatened arrests and agreed to pay a negotiated amount that was typically significantly less than the amount for which the vessel was threatened to be arrested. *Id.* It avers that it, with MarAd's knowledge, intended to utilize the ODS that was payable with respect to then current voyages in making these negotiated payments. *Id.* ¶¶ 47–48. Upon the arrival of the LASH ATLANTICO on May 5, 1986 in Naples, Italy, that vessel was arrested by SIB, a foreign creditor, which liened the vessel in the approximate amount of $300,000. *Id.* ¶ 49. SIB agreed to accept one-half of its claim in cash and the balance over an eight-week period and to transfer its lien to the LASH ITALIA pending payment of the deferred portion. *Id.* ¶ 50. On May 8, 1986, SIB's lien was transferred from the LASH ATLANTICO to the LASH ITALIA and the LASH ATLANTICO departed for the east coast of the United States. *Id.* ¶ 52.

It is then alleged that, PLI thereupon submitted a subsidy voucher of $800,000 to MarAd relating to a voyage of the LASH PACIFICO. *Id.* ¶ 54. On the next day, May 9, 1986, the LASH PACIFICO arrived in the Port of New York at approximately 6:00 a.m. *Id.* ¶ 53. The crewmen received their wages and were released with respect to that voyage and the next voyage officially began. *Id.* MarAd withheld the LASH PACIFICO ODS payment on May 9, 1986 and PLI was thus unable to pay SIB the cash portion of the negotiated amount promised to it or to make other negotiated creditor payments of $125,000 to avoid the arrest of the LASH PACIFICO by two equipment lessors who were owed some $900,000. *Id.* ¶¶ 55, 66–67. Accordingly, PLI alleges that had MarAd released this ODS payment, PLI would have been able to meet its negotiated creditor payments and the LASH PACIFICO would not have been arrested by the equipment lessors and the LASH ITALIA would have been freed from SIB's arrest. *Id.* ¶ 57.

During 1986, MarAd held various preferred ship mortgages on the three PLI

Vessels.[2] According to PLI, MarAd advised it on May 12, 1986, that the LASH PACIFICO ODS payment would not be paid unless PLI presented to MarAd a two-month cash plan acceptable to MarAd showing that: (i) PLI could meet all of its payment obligations during that two-month period, including all Title XI obligations which would become payable during that period, (ii) the Title XI payments with respect to the LASH ATLANTICO and the LASH PACIFICO which had become due on May 1, 1986 would be paid, (iii) PLI could provide for the release of the arrested vessels, and (iv) PLI would have a positive cash flow for the two-month period. *Id.* ¶ 68. On May 14, 1986, PLI presented a two-month cash plan (the "Plan") to MarAd which, it alleges, met all of MarAd's requirements and was premised upon MarAd's release of the withheld LASH PACIFICO ODS payment and the timely payment of all other ODS amounts which would become due during the two-month period. *Id.* ¶¶ 69–70. On May 15, 1986, MarAd is alleged to have informed PLI that it had approved and accepted the Plan, released the withheld LASH PACIFICO ODS payment and informed PLI that it would make all other ODS payments as they became due based on the condition that PLI comply with its Plan and use all ODS payments to implement the Plan. *Id.* ¶¶ 71, 73.

PLI alleges that it was accordingly entitled to believe, and in fact did believe, that MarAd would allow a reasonable time for implementation of the Plan and that MarAd would make timely payment of all ODS amounts due to PLI under the ODS Contract. *Id.* ¶ 74. It thus began to implement the Plan on May 16, 1986 by paying various creditors out of the ODS payment, reopening negotiations with those creditors who had arrested the LASH ITALIA and the LASH PACIFICO, and communicating with its other creditors to seek their continued support. *Id.* ¶ 75. It informed its creditors that it had reached an understanding with MarAd pursuant to which the ODS payment was released and all other ODS payments due to PLI in the future would be timely paid. *Id.* Similarly, it is alleged, MarAd stated to the *Journal of Commerce*, as reported on Friday, May 16, 1986, that it had reached an understanding with PLI pursuant to which the ODS payable to PLI would continue to be paid. *Id.* ¶¶ 77–80.

One day after its arrival in New York on May 18, 1987, the LASH ATLANTICO was arrested by the same equipment lessors who had arrested the LASH PACIFICO asserting liens in the same amount as had been asserted against the LASH PACIFICO. *Id.* ¶ 59. PLI avers that it submitted a subsidy voucher in the approximate amount of $833,000 to MarAd with respect to the terminated LASH ATLANTICO voyage (the "ATLANTICO ODS Payment"). *Id.* ¶ 60. MarAd withheld the ATLANTICO ODS Payment, *id.* ¶¶ 60, 81, and told

**2.** MarAd's Secured Debt Position:

| Vessel | Total Unpaid Title XI Debt Including Interest | Position Of Preferred Ship Mortgage on Vessel Securing Title XI Debt | Total Unpaid Non-Title XI Debt Including Interest | Position of Preferred Ship Mortgage on Vessel Securing Non-Title XI Debt |
|---|---|---|---|---|
| LASH ITALIA | $4,294,773 | first | $18,261,438 | second through twenty-fourth |
| LASH ATLANTICO | $4,835,850 | first | $1,757,564 | third |
| LASH PACIFICO | $4,838,970 | first | — | — |

Complaint ¶¶98–102.

PLI that no further subsidy amounts would be released to PLI because MarAd determined that the Plan could not be implemented. *Id.* ¶ 82. PLI protested. Ultimately, $2,877,352 in ODS payments were withheld. *Id.* ¶ 85.

It is thus alleged that PLI was unable to free its vessels from arrest, was prevented from reactivating its operations, could not carry out any part of the Plan, and thus could not make charter payments under the bareboat charter parties relating to the LASH ATLANTICO and LASH PACIFICO. A portion of those payments was to be used to pay that portion of the Title XI debt that had become due on May 1, 1986. *Id.* ¶¶ 86–87. In June 1986, the trustee representing the holders of the ATLANTICO and PACIFICO Title XI Bonds gave notice to MarAd of the acceleration of the Bonds and demanded payment in full. *Id.* ¶ 89. On June 12, 1986, at the conclusion of a 30–day grace period, MarAd paid the trustee approximately $12 million, representing the full amount of the accelerated principal and interest due on the ATLANTICO and PACIFICO Title XI Bonds. *Id.* ¶ 90. On June 12, 1986 MarAd intervened as an arresting party in the arrests pending against the LASH ATLANTICO and the LASH PACIFICO. *Id* ¶ 91. On August 28, 1986, MarAd obtained an order in the arrest actions requiring a provisional sale of the LASH ATLANTICO and the LASH PACIFICO on September 15, 1986. *Id.* ¶ 92. The provisional sale was temporarily stayed by the filing of an involuntary Chapter 11 petition against PLI on September 12, 1986, but the stay was ultimately lifted pursuant to 11 U.S.C. § 362(b)(12) (1986), *see In re Prudential Lines, Inc.,* 69 B.R. 439 (Bankr.S.D.N.Y.1987), and the vessels were sold.

In seeking relief on the basis of these allegations, PLI charges that MarAd controlled PLI's continued existence because of PLI's dependence on MarAd for continued financial support and the relationship between MarAd, PLI and PLI's creditors gave rise to a fiduciary duty. That duty, according to PLI, required MarAd to act fairly, reasonably, equitably, in good faith and with due care in its dealings with PLI

and to refrain from taking actions or from forcing PLI to take actions that were not in PLI's own best interest. *Id.* ¶¶ 114, 115, 135. PLI further charges that the ODS Contract and the agreement reached in May 1986 to provide PLI a reasonable opportunity to implement the Plan subjected MarAd, a party with superior bargaining position, *see id.* ¶ 124, to a duty of good faith. *Id.* ¶ 120. It therefore asserts that MarAd violated and breached these duties by, *inter alia,* withholding the various ODS payments, unreasonably permitting PLI only one business day within which to completely implement the Plan, and failing to act in cooperation with PLI which would have either prevented the arrest of PLI's Vessels or resulted in their release from arrest. *See id.* ¶¶ 116, 135–36.

In seeking dismissal, Defendants assert: (i) PLI's failure to exhaust its administrative remedies before seeking relief from this Court mandates dismissal; (ii) sovereign immunity bars any affirmative recovery against them in excess of the total of $2,010,534.68 asserted in a claim for taxes filed by the United States and a $200,000 super priority claim previously granted by this Court; (iii) to the extent that PLI's claims sound in tort, they must be dismissed for failure to comply with the jurisdictional prerequisites of the Federal Tort Claims Act; (iv) to the extent that PLI's claims are based on discretionary decisions of executive branch officials in carrying out policies entrusted to them by statute, those decisions are not subject to judicial review because of the doctrine of separation of powers; (v) to the extent that PLI's claims sound in contract, they should be dismissed because: (a) implied in law contracts are not actionable against the United States, (b) both the ODS Contract and a United States statute provide that payment of ODS shall be withheld while a contractor is in default of any obligations due the United States and such payment shall be applied to the satisfaction of such debt, (c) contractual obligations of the United States must be based on written agreement, (d) there was no consideration for any alleged contract modification, (e) any modification

was void due to failure of the condition precedent that the Plan be "acceptable" to MarAd, and (f) there can be no breach of an implied covenant of good faith where the action constituting an alleged breach is expressly permitted in the contract; and (vi) the claims are frivolous.[3] Supplemental Memorandum In Support of Motion to Dismiss at 2–4; see Claim # 96.

We turn now to Defendants' argument that the Complaint should be dismissed by this Court based on the doctrines of exhaustion of administrative remedies and primary jurisdiction.

## II.

In seeking dismissal of the entire Complaint on these grounds, Defendants initially assert that the Complaint essentially concerns a failure to make ODS payments and that the determination of the amount of ODS payments and the obligation to make them should first be made by the Contracting Officer and subsequently reviewed by the MSB. Pursuant to 46 C.F.R. § 282.32(b) the MSB has jurisdiction to hear appeals regarding the Contracting Officer's determination of ODS Amounts before judicial review may be had. But it is not at all apparent that the Contracting Officer or the MSB can determine all the legal issues raised by the Complaint or even that the facts alleged by PLI concerning MarAd's withholding of ODS payments are relevant to determination of the amount of the subsidy. We thus turn first to whether the amount of ODS owing to PLI should be determined initially by the Contracting Officer and later reviewed by the MSB.

The doctrine of exhaustion of administrative remedies recognizes the valuable role that expertized agencies play by providing that, "where a claim is cognizable in the first instance by an administrative agency alone," judicial interference is to be "withheld until the administrative process has run its course." *United States v. Western Pac. R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126, 132 (1956) (Harlan, J.); *accord In re McLean Industries, Inc.*, 70 B.R. 852, 858, 16 C.B.C.2d 645, 652, 15 B.C.D. 864, 867, Bankr.L.Rep. (CCH) ¶ 71,-745, at 91,008 (Bankr.S.D.N.Y.1987). It cannot be disputed that the Contracting Officer and the MSB have special expertise in determining such factual issues as the proper subsidy rate to be applied and, through application of that rate to the various components within the ambit of the subsidy, the amount that would be due and owing to the contractor. *See Aeron Marine Shipping Co. v. United States*, 10 Cl. Ct. 236, 251 (1986); *Newport News Shipbuilding & Dry Dock Co. v. United States*, 7 Cl.Ct. 549, 555 (1985); *Oceanic Steamship Co. v. United States*, 586 F.2d 774, 793–94, 218 Ct.Cl. 87, 121–22 (1978); 46 C.F.R. § 282. Indeed, several "cases have emphasized the necessity that subsidy rates be determined in the first instance by the Maritime Administration." *Oceanic Steamship*, 586 F.2d at 793, 218 Ct.Cl. at 121; *see, e.g., Aeron Marine Shipping*, 10 Cl.Ct. at 251; *Newport News*, 7 Cl.Ct. at 553; *Farrell Lines Inc. v. United States*, 499 F.2d 587, 605, 204 Ct.Cl. 482, 511–12 (1974); *Moore-McCormack Lines, Inc. v. United States*, 413 F.2d 568, 588, 188 Ct.Cl. 644, 676–77 (1969). In referring these cases to the Contracting Officer and the MSB for initial rate determinations, the courts have relied on the doctrine of exhaustion of administrative remedies and on the doctrine of primary jurisdiction. *Compare Aeron Marine Shipping*, 10 Cl.Ct. at 251 (exhaustion of administrative remedies); *Newport News*, 7 Cl.Ct. at 554–55 (exhaustion of administrative remedies)

**3.** In their original motion, Defendants also asserted that PLI had not complied with the requirements for service of process upon an agency of the United States, and that the United States had not filed a proof of claim in PLI's Chapter 11 bankruptcy proceeding and, therefore, it had not waived its sovereign immunity under § 106 of the Code. *See* Memorandum of Law in Support of Motion to Dismiss at 4. PLI subsequently served the United States properly and the Defendants no longer assert improper service as a basis for dismissal. Supplemental Memorandum In Support of Motion to Dismiss at 2. Moreover, the United States has filed a proof of claim in the amount of $2,010,534.68 and, therefore, recognizes that its sovereign immunity does not bar a permissive counterclaim up to that amount. *Id.*

*with Oceanic Steamship,* 586 F.2d at 793, 218 Ct.Cl. at 121 (primary jurisdiction); *Moore-McCormack Lines,* 413 F.2d at 588–89, 188 Ct.Cl. at 678 (primary jurisdiction).

■ In our view, it is the doctrine of exhaustion of administrative remedies which requires referral of the issue of initial rate determination to the MSB.[4] 46 C.F.R. § 282.32(b) (Oct. 1, 1986) sets forth a procedure for appellate administrative review by the MSB of certain determinations of contracting officers that fall within the special expertise of the MSB, such as the extent of foreign competition and the computation of subsidy rates based upon such competition. Moreover, agency determinations of this kind are reviewable only "where said determinations are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Aeron Marine Shipping,* 10 Cl.Ct. at 250 (citations omitted), and thus are not subject to *de novo* review. *See McLean Industries,* 70 B.R. at 858–59, 16 C.B.C.2d at 652–53, 15 B.C.D. at 867–68, Bankr.L.Rep. (CCH) ¶ 71,745, at 91,008. Thus, it appears that the factual issue of subsidy determination is within the exclusive jurisdiction of the Contracting Officer and the MSB.

That jurisdiction, however, does not embrace questions of law, such as the issue of whether an action for breach of contract lies. Those issues "are for the court to decide independently of the board's conclusions thereon which have no finality." *American Export Isbrandtsen Lines, Inc. v. United States,* 499 F.2d 552, 580, 204 Ct.Cl. 424, 471 (1974) (citations omitted); *see Farrell Lines Inc.,* 499 F.2d at 596, 204 Ct.Cl. at 496–97. Thus, there can be no requirement that such questions must be

referred to the Contracting Officer and the MSB for initial determination. *See McLean,* 70 B.R. at 858–59, 16 C.B.C.2d at 652–53, 15 B.C.D. at 867–68, Bankr.L.Rep. (CCH) ¶ 71,745, at 91,008.

■ In light of the foregoing analysis, it becomes plainly apparent that Defendants' assertion that PLI's entire Complaint should be dismissed for failure to exhaust administrative remedies must fail. Further, the Complaint raises issues beyond determination of the amount of the subsidy. The MSB has no special expertise in determining issues of contract law. Such issues are well within the competence of this Court. Dismissal of PLI's Complaint would be highly inappropriate because the Complaint alleges a breach of contract and raises "only, incidentally a question proper for initial administrative decision." *See Far East Conference v. United States,* 342 U.S. 570, 577, 72 S.Ct. 492, 497, 96 L.Ed. 576, 583 (1952). Upon the Contracting Officer's and the MSB's determination of the proper components and rates necessary to compute the ODS actually owed to PLI (the "Actual Withheld ODS Amount"), the parties are advised to inform the Court in order that the remaining issues of law, such as whether Defendants entered into a modification or waived their right to assert the Crew Differential in order to reduce the amount of ODS payable to PLI, can be resolved. *See* R.J. Pierce, S.A. Shapiro & P.A. Verkuil, *Administrative Law & Process* 194–95 (1985).

### III.

■ Even were we to find that the Debtor need not exhaust its administrative rem-

---

**4.** While an administrative remedy may be deemed inadequate and unavailable if an agency refuses to act or takes an inordinate period of time to act, *see Newport News,* 7 Ct.Cl. at 554; *Manpower, Inc. of Tidewater v. United States,* 513 F.2d 1396, 1398, 206 Ct.Cl. 726, 731 (1975), such a delay has not yet occurred here. In the absence of such circumstances, the doctrine of exhaustion of administrative remedies applies. The holding in *Kenny v. Block (In re Kenny),* 75 B.R. 515, 521, 16 B.C.D. 31, 35 (Bankr.E.D.Mich. 1987), denying the applicability, under Code § 106(a), (b), of the Federal Tort Claims Act's requirement that the claimant shall first present

its claim to the appropriate federal agency and that the claim shall be finally denied by the agency before an action can be instituted, *see* 28 U.S.C. § 2675(a), cannot be said to indicate that the doctrine of exhaustion of administrative remedies will never apply in bankruptcy court. The "exhaustion doctrine is a prudential rule created by the courts to enable them to allocate responsibilities efficiently between agencies and courts" and, unlike the final agency action requirement, it is not based on a statutory requirement. R.J. Pierce, S.A. Shapiro & P.A. Verkuil, *Administrative Law & Process* 190 (1985).

edies to determine the Actual Withheld ODS Amount, we would properly defer determination of that issue to the MSB as falling within the MSB's primary jurisdiction. *See Aeron Marine Shipping Co.*, 10 Cl. Ct. at 251 n. 10; *see, e.g., Oceanic Steamship*, 586 F.2d at 793, 218 Ct. Cl. at 121–22. Primary jurisdiction, like the conceptually analogous doctrine of exhaustion of administrative remedies, is a prudential rule "created by the courts to allocate between courts and agencies the initial responsibility for resolving issues and disputes in a manner that recognizes the comparative advantages of agencies and courts." R.J. Pierce, S.A. Shapiro & P.A. Verkuil, *Administrative Law & Process* 206 (1985). The doctrine of primary jurisdiction enables courts to "defer resolution of a technical factual issue to an administrative agency having expertise beyond the normal competence of judges in order to preserve consistency and uniformity in regulation of the business entrusted to that agency." *In re McLean Industries, Inc.*, 76 B.R. 328, 331 (Bankr.S.D.N.Y.1987). The "intricate, specialized, and indeterminate nature" of the ODS determination "makes it peculiarly appropriate for an expert administrative body with continuing experience in the field" to initially determine the amount of ODS owed. *Moore-McCormack Lines*, 413 F.2d at 588, 188 Ct.Cl. at 677.

■ That this one issue should be decided initially by the Contracting Officer and reviewed by the MSB does not, however, make it appropriate for them to hear and make a determination of all the issues raised by PLI's Complaint. While dismissal of the Complaint would be appropriate if the entire dispute before this Court was within the primary jurisdiction of the Contracting Officer and the MSB, such is inappropriate here since only one of the issues raised in this action falls within their primary jurisdiction. *See R.J. Pierce, S.A. Shapiro & P.A. Verkuil, Administrative Law & Process* 206 (1985). Because the other issues raised involve facts "within the general competence of judges," *see McLean Industries*, 76 B.R. 328, 333 (Bankr. S.D.N.Y.1987), and legal issues involving the Merchant Marine Act, the Bankruptcy Code and the common law of contracts, deferral to an agency is inappropriate, *id.* at 337.

## A. Allocation Between Specialized Courts

■ Defendants further assert that, pursuant to the doctrine of primary jurisdiction, this Court should defer the entire case to the United States Claims Court. While primary jurisdiction is generally viewed as "a concept used by courts to allocate initial decision making responsibility between agencies and courts where such overlaps exist," *Administrative Law & Process* at 206, it may also apply to allocate initial decision making responsibility between specialized courts where resolution of complex and highly technical factual issues, within the expertise of one of those courts, is required. *See McLean Industries*, 76 B.R. 328, 331–32, 334 (Bankr.S.D.N.Y.1987).

■ On this score, Defendants place great weight on the expertise of the MSB and the Claims Court in the resolution of disputes over a contract with the United States for payment of ODS. To the extent that calculation of ODS amounts is necessary, we agree that such falls within the expertise of the MSB. However, to the extent that Defendants urge us that the other facts in this dispute relevant to, *inter alia,* breach of contract, lender liability, turnover, and equitable subordination causes of action are technical, esoteric and beyond our expertise, we cannot agree. Such issues are clearly within the general competence of bankruptcy judges and controversies relating to the facts underlying such causes of action are resolved frequently by evidentiary hearings held by bankruptcy courts. The fact that the United States is a party to the contract brings into play various statutes that may vary application of the common law of contracts. This alone, however, does not make deferral appropriate. Analyzing legislative history and interpreting statutes are precisely the legal tasks which fall within the general competence of judges.

Moreover, the resolution of this dispute will also involve the application of substantial principles of bankruptcy law. For example, the ranking of creditors' claims for satisfaction in one forum goes to the very nature of the bankruptcy process and beyond the "administrative convenience of settling all disputes in a single forum...." *Gary Aircraft Corp.*, 698 F.2d at 783. PLI's claim for equitable subordination seeks to subordinate Defendants' claims to those of its other creditors. In determining whether a claim is to be subordinated pursuant to § 510(c)(1) of the Code, 11 U.S.C. § 510(c)(1), the bankruptcy court draws from its equitable powers in order to "correct the results of inequitable or fraudulent conduct not otherwise voided by the express provisions of the bankruptcy laws...." DeNatale & Abram, *Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law. 417, 422 (1985). This doctrine does not involve a mechanical application of a statute to the facts [5] and appears to be peculiarly appropriate for resolution in the bankruptcy court which may ensure that "all creditors are treated fairly." *Gary Aircraft Corp.*, 698 F.2d at 783.

Nevertheless, most important among the considerations to be weighed under the doctrine of primary jurisdiction is whether PLI's claims "might have to be tried twice." *See Gary Aircraft Corp. v. United States*, 698 F.2d 775, 784 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983). Defendants' position on this point is somewhat ambiguous. While they indicate that this consideration is not applicable in this case, *see* Supplemental Memorandum in Support of Motion to Dismiss at 6, they assert that sovereign immunity bars any determination of governmental liability by this Court other than a permissive counterclaim not exceeding $2,210,-

534.68. If the Defendants are correct in their assertion that PLI cannot obtain affirmative recovery in this Court, then retention of this case could require the issues to be tried twice. Whether PLI can obtain affirmative recovery depends on the extent of the Government's waiver of sovereign immunity.

### B. *Sovereign Immunity*

In determining whether the Government has waived its sovereign immunity we are guided by the touchstones that waivers are to be fully enforced and " 'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.' " *Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S.Ct. 2698, 2702, 69 L.Ed.2d 548, 553–54 (1981) (quoting *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306, 311 (1957)).

### (1) *Code § 106.*

In asserting that this case belongs here, PLI contends that the waivers of immunity provided by 11 U.S.C. § 106(a) and (c) enable Defendants to be sued before this Court for the full amounts demanded in their Complaint. Defendants deny that subsections (a) and (c) of § 106 apply here and assert that subsection (b) is controlling. That subsection limits the Government's waiver of sovereign immunity to permit PLI to offset its claim against the proof of claim filed by the Internal Revenue Service in the amount of $2,010,534.68 plus the $200,000 administrative priority claim previously granted by this Court.

Section 106(a) provides that a "governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of

---

5. Equitable subordination may be ordered when the following three conditions are met:

(i) The claimant must have engaged in some type of inequitable conduct ... [;]
(ii) The misconduct must have resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant ... [; and]

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]....

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977) (citations omitted); *see Unsecured Creditors Committees v. Pioneer Commercial Funding Corp. (In re Pacific Express, Inc.)*, 69 B.R. 112, 116 (Bankr. 9th Cir. 1986).

which such governmental unit's claim arose." 11 U.S.C. § 106(a). If this subsection applies, the Government's waiver is without limitation and the Debtor is entitled to affirmative recovery. H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1977); S.Rep. No. 989, 95th Cong., 2d Sess 29–30 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5815–16, 6274; *see Kenny v. Block (In re Kenny)*, 75 B.R. 515, 521, 16 B.C.D. 31, 35 (Bankr.E.D.Mich. 1987); *State of West Virginia, Department of Finance and Administration v. Hassett (In re O.P.M. Leasing Services, Inc.)*, 21 B.R. 993, 1002, 9 B.C.D. 542, 545 (Bankr.S.D.N.Y.1982).

■ The Defendants, however, contend that § 106(a) does not apply because PLI's claim did not arise out of the same transaction or occurrence as their tax and superpriority claims and they have not filed a proof of claim in the amount of their deficiency claims with respect to the Title XI obligations secured by PLI's Vessels (the "Deficiency Claim"). PLI does not argue that the filing of the tax claim subjects Defendants to liability under § 106(a). Rather, it asserts that Defendants are considering filing a proof of claim to assert their Deficiency Claim and that the Complaint should not be dismissed until the Government has determined whether it will assert its Deficiency Claim here and thereby subject itself to § 106(a)'s waiver (Tr. 4/7/87 at 24–25). PLI argues that dismissal prior to such a determination by Defendants would be premature (*id.* at 24). Defendants, on the other hand, argue that the ODS transactions do not arise out of the same transaction or occurrence as PLI's Title XI obligations (*id.* at 25). This argument we find untenable because, *inter alia*, the Complaint alleges that PLI would have been able to timely meet its Title XI obligations, its debt would not have been accelerated and MarAd would not have been forced to honor its guarantee if Defendants would have acted in accordance with the terms of the Plan. Complaint ¶¶ 87–91.

■ Nevertheless, Defendants failure, to this point, to file a proof of claim asserting their Deficiency Claim prevents us from concluding that they have waived their immunity under § 106(a). While some courts have concluded that a formal proof of claim need not be filed by a governmental unit in order for it to waive its sovereign immunity under § 106(a), *see, e.g., In re Inslaw, Inc.*, 76 B.R. 224, Bankr. L.Rep. (CCH) ¶ 71,903, at 91,619 (Bankr.D. C.1987); *Gower v. Farmers Home Administration (In re Davis)*, 20 B.R. 519, 520–21, 6 C.B.C.2d 1022, 1024, 9 B.C.D. 113, 114 (Bankr.M.D.Ga.1982), we cannot find that Defendants have waived their sovereign immunity by merely considering whether they should file a proof of claim for their Deficiency Claim. Section 106(a) does not so provide. Nevertheless, we recognize that the purpose of § 106(a) is to prevent a governmental unit from receiving a "distribution from the estate without subjecting itself to any liability it has to the estate" arising from the same transaction or occurrence upon which its right to distribution is based. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 29–30 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5815–16, 6274. Thus, the *Davis* court was concerned that granting a governmental entity's motion to dismiss an adversary proceeding based on its assertion of sovereign immunity would be patently unfair when it could subsequently amend its informal claim and assert the right to distribution from the estate that, if asserted previously, would have precluded it from asserting the defense of sovereign immunity. *See Davis*, 20 B.R. at 523.

■ The remedy for this problem does not lie, however, in finding a filed claim where none has been filed. It is more appropriate to set a bar date for the Defendants to file a proof of claim if they are inclined to do so. *Cf.* Fed.R.Bankr.P. 3003(c)(3). Through utilization of that device, jurisdiction will be clarified.

■ Seeking to sustain jurisdiction in the event that the Government does not file a proof of claim for its Deficiency Claim, PLI asserts that Defendants have waived their sovereign immunity pursuant to

§ 106(c) of the Code. There provided is "a waiver of sovereign immunity to the extent that an order of the bankruptcy court will bind a governmental unit when the court makes a determination and issues an order pursuant to a Code section allowing the court to bind a 'creditor,' 'entity' or 'governmental unit.'" *Lawson Burich Associates, Inc. v. Axelrod (In re Lawson Burich Association, Inc.)*, 59 B.R. 681, 689, 14 B.C.D. 354, 359–60 (Bankr.S.D.N.Y.1986). Because PLI's breach of contract causes of action are not based on any provision of the Code, Defendants cannot be held to have waived their immunity as to those claims under § 106(c). However, PLI's claims for equitable subordination and turnover of the Withheld ODS Amount are based on Code sections and thus must be further analyzed to determine if they fall within the scope of § 106(c)'s waiver of immunity.

PLI's claim for equitable subordination is based on § 510(c) of the Code. 11 U.S.C. § 510(c). Section 510(c), while not specifically employing the words "creditor," "entity" or "governmental unit," does refer to subordination of an "allowed claim."[6] An "allowed claim" is defined under Code § 502, *id.* § 502, as a claim filed under § 501, *id.* § 501. Section 501 refers to creditors. *See id.* § 501. Therefore, a determination by this Court that the Defendants' claim should be equitably subordinated would be within the Government's waiver of sovereign immunity pursuant to § 106(c) of the Code. *See id.* § 106(c).

This waiver of immunity, however, does not reach PLI's turnover claim seeking payment of the Withheld ODS Amount. That claim is brought under § 542(b) of the Code, *id.* § 542(b), which applies to entities and thus, could be covered by § 106(c)'s waiver.[7] But since the Actual Withheld ODS Amount has yet to be determined in accordance with the proper administrative procedures and is subject to a contractual dispute, that amount cannot yet be said to be "matured, payable on demand, or payable on order" and thus does not fall within § 542(b). PLI's turnover claim, therefore, cannot yet be held to be within § 106(c)'s waiver of sovereign immunity. Moreover, even if the Actual Withheld ODS Amount was within § 106(c), PLI would not be entitled to the complete affirmative relief it seeks because the alleged Withheld ODS Amount that it seeks to have turned over falls far short of the damages it seeks in its Complaint.

### (2) *Tucker Act*

As an alternative to subsections (a) and (c) of Code § 106, PLI seeks to ground its right to complete relief on the waiver of sovereign immunity contained in the Tucker Act. *See* 28 U.S.C. §§ 1346, 1491.

The Tucker Act (codified at 28 U.S.C. §§ 1346, 1491) grants concurrent jurisdiction to the district court and the Claims Court (formerly the Court of Claims) over money claims against the United States not exceeding $10,000. For claims against the United States involving amounts greater than $10,000 founded upon the Constitution, Acts of Congress, executive regulations, or contracts, the Act vests *exclusive* jurisdiction with the Claims Court.

*New Mexico v. Regan*, 745 F.2d 1318, 1322 (10th Cir.1984) (citations omitted), *cert. denied sub nom. New Mexico v. Baker*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496

---

6. Section 510(c) provides:
 Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
 (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of an allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
 (2) order that any lien securing such a subordinated claim be transferred to the estate.
 11 U.S.C. § 510(c).

7. Section 542(b) of the Code provides:
 Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.
 11 U.S.C. § 542(b).

(1985). "If a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580, 590 (1983); *see Army & Air Force Exchange Service v. Sheehan*, 456 U.S. 728, 734, 102 S.Ct. 2118, 2122, 72 L.Ed.2d 520, 526 (1982); *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 466, 100 S.Ct. 647, 651, 62 L.Ed.2d 614, 619 (1980) (*per curiam*).

 It is often stated that the Tucker Act grants exclusive jurisdiction to the Claims Court to render judgment upon claims against the United States that are based on an "express or implied contract with the United States" exceeding $10,000 in amount, 28 U.S.C. §§ 1491, 1346(a)(2); *see New Mexico v. Regan*, 745 F.2d at 1322. But, 28 U.S.C. § 1334(b) provides: "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." This section, together with 28 U.S.C. § 157, grants this Court jurisdiction to hear a claim normally brought under the Tucker Act. Jurisdiction, however, differs from a waiver of sovereign immunity. 28 U.S.C. § 1334(b) does not incorporate the Tucker Act's separate waiver of sovereign immunity for claims exceeding $10,000. The Tucker Act's waiver of sovereign immunity is inextricably tied to its jurisdictional terms. *See Hahn v. United States*, 757 F.2d 581, 586 (3d Cir.1985).

 Moreover, 28 U.S.C. § 1334(b) should not be construed to contain an independent waiver of sovereign immunity in bankruptcy cases. It is elementary that a statute is to be construed in light of the provisions of related statutes. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539, 548 (1975). Since a distinct and limited waiver of sovereign immunity in bankruptcy cases is contained in 11 U.S.C. § 106, the implication of yet another waiver in 28 U.S.C. § 1334(b) would effec-tively negate the limitations articulated in Code § 106. There is not the slightest indication that Congress intended such a result.

 Consequently, the Tucker Act's waiver of sovereign immunity in cases brought in this Court is limited to claims not exceeding $10,000; under the terms of the Tucker Act waiver, the district court is granted concurrent jurisdiction over claims not exceeding that amount. Thus, were the Tucker Act the only waiver applicable here, PLI's contract claims could remain in this Court, only if PLI were to elect to waive recovery in excess of $10,000. *See Chabal v. Reagan*, 822 F.2d 349 (3d Cir. 1987) ("courts have generally permitted plaintiffs to remain in the district court even if their monetary claims against the United States within the scope of the Tucker Act exceed $10,000 in amount, as long as plaintiffs waive [recovery] in excess of $10,000"). Although PLI can maintain claims in this Court against the United States for equitable subordination and for offset up to $2,210,534.68, *see Pacificorp v. Federal Energy Regulatory Commission*, 795 F.2d 816, 826 (9th Cir.1986) (Wallace, J., concurring in part) ("jurisdiction under the Tucker Act is not exclusive where other statutes independently confer jurisdiction and waive sovereign immunity"); *Munoz v. Small Business Administration*, 644 F.2d 1361, 1364–65 (9th Cir.1981); *In re Inslaw, Inc.*, 76 B.R. 224, Bankr.L.Rep. (CCH) ¶ 71,903, at 91,623 (Bankr.D.C.1987), its reliance on the Tucker Act may enable it to obtain only an additional $10,000 in affirmative recovery.

C. *Failure to Comply With Jurisdictional Prerequisites of the Federal Tort Claims Act*

 Defendants assertion that, to the extent they sound in tort, PLI's claims must be dismissed for failure to comply with the jurisdictional prerequisites of the Federal Tort Claims Act cannot be sustained. They assert that PLI's failure to submit an administrative tort claim to the Defendants violates the Federal Tort Claims Act, *see* 28 U.S.C. §§ 2674, 2675,

and requires dismissal of PLI's tort claims. *See* Memorandum of Law in Support of Motion to Dismiss at 12–13. The Code's waiver of sovereign immunity is, however, separate and distinct from the FTCA waiver and, thus, the conditions of the FTCA are not applicable. *In re Inslaw, Inc.*, 76 B.R. 224, Bankr.L.Rep. (CCH) ¶ 71,903, at 91,623 (Bankr.D.C.1987) ("the Bankruptcy Code's explicit waivers of sovereign immunity are entirely distinct, separate and independent from and in addition to those found in any other statute, including the FTCA"); *Kenny v. Block (In re Kenny)*, 75 B.R. 515, 521, 16 B.C.D. 31, 35 (Bankr.E.D.Mich.1987); *cf. United States v. Pacific Far East Lines, Inc.*, 809 F.2d 1435, 1438 (9th Cir.1987) (absence of separate waiver).

### D. *Reconciliation*

We are thus left with a case where considerations of factual expertise do not require, under the theory of primary jurisdiction, deferral of the issues except for calculation of the ODS payments withheld by MarAd, but where the relief sought in the Complaint can be only partly entertained at this stage due to the constraints of the waivers of sovereign immunity contained in 11 U.S.C. § 106 and the Tucker Act. To this is to be added the notion that the issue cannot ultimately be determined until it is known whether the Defendants will file their Title XI Deficiency Claim. Not until that is known, moreover, can PLI intelligently assess whether it will limit the damages it seeks here if Defendants do not file their Deficiency Claim, or seek those damages in the Court of Claims, while preserving its equitable subordination claim here.

 Considerations of judicial economy and fairness thus require that Defendants should be compelled to file their Title XI claims in sixty days or be barred from filing such claims. In this there is no prejudice since the vessels have been foreclosed in admiralty and the claims can be estimated. If those claims are not filed, PLI should then determine, within thirty days, if it wishes to limit its damage claims so

that they can be tried here or bring them in the Court of Claims. Trying these complicated factual issues twice is to be avoided. Although this Court can try limited damage claims within the $10,000 limitation of the Tucker Act and award a setoff under § 106(b), the assertion of damage claims of a far greater amount strongly indicates that all such claims should be tried in the Claims Court. Since the power to subordinate allowed claims under Code § 510 rests exclusively with this Court and since the subordination claim is based on the same facts as PLI's damage claims, this Court can try that issue after a decision by the Court of Claims and thereby have the benefit of the doctrine of collateral estoppel. If PLI decides to limit its demands for affirmative relief to that which can be fully entertained here, the damage claims, as limited, and the equitable subordination claim can be tried together.

### IV.

In light of the current uncertainty of which court will be required to address the damage claims, and although we are prepared to rule, we decline to address the remainder of the points raised by Defendants until it becomes clear where those claims will be heard. Those points concern whether or not PLI's damage claims for breach of contract, fiduciary duty and the like are sustainable in law. They thus involve the merits of the dispute rather than the ability of this Court to hear it.[8] Until it is determined where the damage claims are to be tried, it would be inappropriate for this Court to rule. Thus, the remainder of the motion is denied without prejudice, Defendants are to file their Title XI claims within 60 days from the date hereof or be barred from doing so and PLI, if such claims are not filed, is to elect within thirty days thereafter whether to limit its claims for relief and proceed here or to bring its claims in the Court of Claims. It is

SO ORDERED.

---

**8.** Since this decision is limited to this Court's jurisdiction and that issue is clearly a core matter, we make no determination of whether the underlying dispute, other than the equitable subordination claim which is clearly a core matter, is a core proceeding.