### In re The DREXEL BURNHAM LAMBERT GROUP INC., et al., Debtors.

### Bankruptcy No. 90B–10421.

United States Bankruptcy Court, S.D. New York.

Oct. 22, 1990.

As Corrected Nov. 14, 1990.

Weil, Gotshal & Manges, New York City by Richard P. Krasnow and Corinne Ball, for The Drexel Burnham Lambert Group Inc. and Drexel Burnham Lambert Inc.

Leader & Berkon, New York City by James K. Leader, for the Chicago Bd. of Trade.

Neufeld & O'Leary, New York City by David S.J. Neufeld, for John Benjamin, Kenneth Karmin and Thomas Papastefan.

Sugar, Friedberg & Felsenthal, Chicago, Ill. by Andrew B. David, for John Benjamin, Kenneth Karmin, Thomas Papastefan and John Rabb.

Arvey, Hodes, Costello & Burman, Chicago, Ill., for Kenneth Karmin.

Jones, Day, Reavis & Pogue, New York City by Cindy Tzerman and Michael Guss, for the Official Committee of Unsecured Creditors of The Drexel Burnham Lambert Group Inc.

Milgrim, Thomajan & Lee, New York City by Claude Montgomery, for the Equityholders' Committee of The Drexel Burnham Lambert Group Inc.

Zalkin, Rodin & Goodman, New York City by Menachem O. Zelmanovitz and Jay Teitelbaum, for the Official Committee of Unsecured Creditors of Drexel Burnham Lambert Inc.

## DECISION

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

Before the Court is the motion of The Drexel Burnham Lambert Group Inc. ("Group") and Drexel Burnham Lambert Incorporated ("Inc.," together with Group, the "Debtors") to adjudge former employees of Inc. who are members (the "Members") of the Chicago Board of Trade (the "CBOT," or the "Board") in violation of the automatic stay provided in section 362 of 11 U.S.C. §§ 101 *et seq.* (1988) (the "Code"), by filing and prosecuting certain claims before the CBOT arising out of stock and subordinated debt holdings in Group against proceeds of sale of Inc.'s memberships in the CBOT. Sanctions are sought pursuant to section 362(h) of the Code for costs and attorneys fees incurred in prosecuting this motion. The Members have cross-moved to modify the automatic stay,

if applicable, to allow the CBOT to proceed with its determination of these claims. For the reasons discussed herein, the Debtors' motion is denied and the cross-motion is granted only to the extent specified below.

## I

### A

Group filed for relief under Chapter 11 of the Code on February 13, 1990. Its wholly owned subsidiary, Inc., a registered broker-dealer, followed suit on May 29, 1990. Their cases, along with those of seventeen other affiliated debtors, were consolidated on June 20, 1990 for procedural purposes only under Fed.R.Bankr.P. 1015(b).

The CBOT is a commodity futures exchange chartered by the Illinois legislature in 1859 and designated a contract market pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (1986). Motion ¶ 9; CBOT Memo. p. 4. Membership in the CBOT is subject to its self-promulgated rules. Motion ¶ 10; CBOT Memo. p. 4. The transfer of CBOT memberships, for example, may only be effectuated through an exchange sponsored marketplace. CBOT Rules 249 and 250; Motion ¶ 10; CBOT Memo. p. 4.

Also regulated is the distribution of proceeds from the sale of any membership. Motion ¶ 11; CBOT Memo. p. 4. CBOT Rule 252(a) provides in relevant part:

Upon any transfer of membership, whether made by a member voluntarily or by the Board, the proceeds shall be applied to the following purposes and in the following order of priority:

. . . .

(6) Sixth, the payment to members and member firms of all claims filed under Rule 253.00 otherwise arising from Members' Contracts, exclusive of personal debts which are not related to the conduct of business as a broker, trader or commission merchant, and which claims have been allowed by the Board.

. . . .[1]

---

1. No claim is made by any of the Members that any priority other than that under Rule

Motion ¶ 12, Ex. A; CBOT Memo. p. 4, Ex. "Members' Contracts" are defined in CBOT Rule 916.00 in pertinent part as:

> [a]ll contracts of members of the Association, or of firms or corporations registered under the Rules and Regulations, with other members of the Association, or firms or corporations registered under the Rules and Regulations, for the purchase or sale of commodities, or for the purchase, sale, borrowing, loaning, or hypothecation of securities, or for the borrowing, loaning or payment of money, whether occurring upon the floor of the Exchange or elsewhere. . . .

Motion ¶ 13; CBOT Supp. Memo. p. 6. Thus, the claims of members have priority over those of non-members. Motion ¶ 15; CBOT Memo. p. 4. If the proceeds are insufficient to pay all claims allowed by the Board, claims within a priority are generally paid pro rata. CBOT Rule 252(b). The selling member will receive the remaining proceeds, if any. CBOT Rule 252(c). In arriving at an allowance or disposition of an asserted claim, the Board may (i) treat unmatured claims as matured and fix such claims based on market value or on any other basis it deems fair and just; (ii) reserve and retain from proceeds such amount it deems appropriate pending determination of the amount due on a contingent claim; or (iii) require a claimant to resort to collateral held by it and credit the selling member the fair value of the collateral. CBOT Rule 252(d)(1)(2)(3). It is thus apparent that absent bankruptcy, the Board has broad authority to determine all claims against sale proceeds of a membership.

Group has never been a member of the CBOT. Motion ¶ 9. Inc. has, however, owned several memberships in the CBOT, nine of which it sold prior to the commencement of its bankruptcy case. *Id.* Those sales generated proceeds aggregating approximately $2,927,500. *Id.* This Court authorized on September 11, 1990 the sale of an additional CBOT membership owned by Inc. which sale will generate additional proceeds (together with the $2,927,500, the "Proceeds"). *Id.*

Ten individuals filed claims against the Proceeds in the aggregate amount of approximately $3.7 million. Motion, Ex. F; The instant motion, however, concerns only those claims for approximately $3.5 million filed by four former employees of Inc. who are members of the CBOT. Motion ¶ 16; Transcript of Hearing of Sept. 27, 1990 ("Tr.") 6, 7, 10–12, 55–57. John Benjamin submitted, in April 1990, a claim, corrected for typographical error on May 14, 1990, for $3,223,789, against the Proceeds. Motion, Ex. B. The claim is based on equity holdings in Group which he received as compensation for services performed as a senior vice president of Inc., which stock was allegedly converted, upon his resignation in January 1990, into subordinated debt of Group in accordance with Inc.'s bylaws. *Id.* In a letter annexed to his claim, Mr. Benjamin asserted that "[i]n light of the [Group] bankruptcy, he has no realistic likelihood of receiving any payment from [the] bankrupt parent." Kenneth Karmin submitted claims in April 1990 for $308,721.40 based on promissory notes allegedly evidencing subordinated obligations of Group. Motion, Ex. C. Thomas Papastefan submitted claims in April 1990 which he reduced on May 14, 1990. Motion, Ex. D. He claimed $9,030 for deferred compensation on account of his holdings of preferred stock of Group. *Id.* John Rabb submitted a claim on May 7, 1990, reduced on May 30, 1990. Motion, Ex. E. Mr. Rabb claimed $24,147 for "[r]efund of monies deducted involuntarily for Drexel preferred stock." *Id.*[2]

---

252(a)(6) applies. The first five priorities relate to dues, assessments, fees, fines and the like owed the CBOT or the "Clearing House"; amounts for trading losses due the selling member's "Primary Clearing Member" or other "Clearing Member"; and amounts loaned by a member in connection with the selling member's purchase of the membership.

**2.** Messrs. Karmin, Papastefan, and Rabb also claimed amounts for unpaid commissions, severance pay, profit-sharing, bonuses, and retirement benefits. Motion, Exs. C, D, E. At no time have the Debtors sought relief with respect to the pursuit of such claims, or those of the other six claimants. Tr. 6, 7, 10–12, 55–57. Supp. Memo., pp. 7–8. We discuss arguments made with respect to those claims, *see* n. 18, 19,

In its response of August 2, 1990 to the CBOT, Inc. stated that because of the Chapter 11 filings, "[t]o the extent claims filed against the proceeds are not within the scope of those claims permitted under the rules of the CBOT, pursuit of those claims violates the automatic stay and will constitute contempt of court." Motion, Ex. F. In this regard, Inc. elaborated that (i) under CBOT Rule 252(a)(6), the only arguably applicable priority, only claims against a selling member could be asserted against the Proceeds and since the subject claims of the Members were not claims truly assertable against Inc., but against Group, over which the bankruptcy court had exclusive jurisdiction, the prosecution of those claims before the CBOT would violate the automatic stay protecting Group and Inc.; and (ii) since such claims did not arise from transactions on the CBOT, and were simply based on employment relationships with Inc., they could not, under CBOT Rule 252, be satisfied from the proceeds. *Id.*

The relevant responses from the Members, dated August 24 and August 27, 1990, may be characterized as arguments based on: (i) an alter ego, piercing the corporate veil, or similar theory; (ii) the existence of and breach of employment contracts; and (iii) transactions arising out of Members' Contracts. More specifically, Mr. Benjamin's response asserted that Inc., not Group, is liable for his claim because Group was Inc.'s alter ego and their corporate veils should be pierced, if not for all purposes, for the subject transaction or series of events. Motion, Ex. G. Mr. Karmin similarly contended that, with respect to the indebtedness on the promissory notes, Group and Inc. were always treated as one entity; their dealings were "incapable of meaningful separation;" and the purchase of Group stock, and therefore Group subordinated debt, was inextricably linked with employment at Inc. Motion, Ex. H.

Mr. Papastefan argued in his response that Inc. owed him $9,030 deferred compensation in cash and sought to pay him in stock of Group which he never received and was not obligated to, and did not, accept. Motion, Ex. I. Mr. Rabb similarly claimed in his response that he was entitled to $24,147 as deferred compensation and never agreed to accept stock in Group in lieu of cash from Inc. Motion, Ex. J.

Finally, Mr. Benjamin argued that his claim involved a "Members' Contract" because it arose from a "contract among members, relating to the members' CBOT business, for the payment of money, and also involves the purchase and sale of securities." Motion, Ex. G. Mr. Karmin asserted that his entire claim related to either transactions which occurred on the floor of the CBOT in connection with trades in Treasury Bond Futures Contracts and Options on Treasury Bond Futures Contracts, or the sale of his securities for which he is entitled to compensation. Motion, Ex. H. Mr. Rabb likewise contended that all of his claims arise from his work on the floor of the CBOT as a manager executing contracts for Inc. and related entities. Motion, Ex. J.

In a response with the Board on Sept. 6, 1990, Inc. asserted that no party contended that claims against non-members such as Group could be satisfied out of the Proceeds: since the subject claims of the Members against Inc. could lie only were the corporate veils to be pierced, Motion, Ex. K, pursuit of such claims were attempts to circumvent the automatic stay protecting Group. *Id.* Inc. also dismissed the argument that an employee's holdings in Group equity or debt arose from employment with Inc. and should therefore be satisfied from the Proceeds, reasoning that once the employee received his compensation in the form of Group stock or debt, claims could only be asserted against the issuing corporation. *Id.* Inc. again admonished that pursuit of such claims before the CBOT, Inc. argued, would constitute a violation of the automatic stay protecting Group. *Id.*

however. Although relief is not requested with respect to them, they do not appear to fall within the expertise of the CBOT and nothing herein should be construed to defer the determination of such issues to the CBOT.

Inc. also argued that Rule 252(a)(6), particularly the language excluding claims which are personal debts not related to the conduct of business as a broker, trader or commission merchant, evinces that the term "Members' Contracts" must be defined in accordance with the scope and purposes of the CBOT. Thus, claims based solely on employment relationships, even if the claimant worked on the floor of the CBOT, should be disallowed. *Id.*

## B

### (i)

Upon motion by the Debtors and on notice to the parties in interest, the Court on September 17, 1990 ordered the Members to show cause why they should not be adjudged as having violated the automatic stay and assessed costs and attorneys fees incurred in connection with the motion, pursuant to sections 362(h) of the Code and Fed.R.Bankr.P. 9020.[3]

Initially, the Debtors conceded that *Chicago Board of Trade v. Johnson*, 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1924), established that the bankruptcy estate has an interest only in the net proceeds of sale of a membership, after satisfaction of claims allowed under the CBOT Rules. They therefore did not deny that claims properly assertable against the Proceeds under the CBOT Rules could be determined notwithstanding commencement of a bankruptcy case. Motion ¶¶ 14, 41; Tr. 6, 7, 10–12, 55–57. They argued, however, that since

the CBOT rules contemplate that claims against a selling member only may be asserted, continued pursuit of claims against non-members before the CBOT was not sanctioned by the Supreme Court in *Johnson*. Motion ¶¶ 16–17, 19–21, 41; Tr. 6, 7, 10–12, 55–57.

The Debtors thus initially alleged only the following violations of the automatic stay: (i) under section 362(a)(1) of the Code, the prosecution of what are in fact claims against Group, as evidenced by the assertion of an alter ego theory and holdings in Group stock and debt; (ii) under section 362(a)(3), engaging in acts to obtain possession of property of the Inc. estate, *i.e.*, proceeds remaining after satisfaction of properly asserted claims against members; and (iii) under section 362(a)(6), taking acts seeking to collect on pre-petition claims against Group in a manner proscribed by section 362(a)(6). Motion ¶ 28; Memo. pp. 11–12; Response ¶ 5. In this, the Group Creditors' Committee and the Inc. Creditors' Committee concurred. Sanctions are sought for the Members' contumacious conduct in the face of two explicit warnings. Motion ¶¶ 25–30. Pursuit of other claims against Inc. by the Members or by the six other claimants were not contended to be in violation of the automatic stay. Tr. 6:10–25, 7:1–6, 10:18–25, 12:3–17, 55:24–57:17. By having this Court find a violation of the automatic stay, the Debtors and the creditors apparently believe that all but $200,000 of the $3.7 million claims asserted will be void, Tr. 35:14–22, 60:21–25, 61:1–8, and

---

**3.** The Debtors also sought an order temporarily restraining the Members and their agents from prosecuting Group claims against the Proceeds and the CBOT from determining the validity of Group claims or making any distribution in payment of Group claims. The Debtors apparently learned that the CBOT would determine the validity of the claims by the Respondents on September 18, 1990, and disburse the Proceeds the next day in accordance with its determination, Krasnow Aff. ¶ 3. The request for a temporary restraining order was mooted by the CBOT's agreement not to consider the determination of the Members' claims and distribute the Proceeds in accordance with its decision until mid-October. It agreed to further adjourn the CBOT hearing to November 20, 1990 when the Court provided the parties an opportunity to brief certain issues.

Although the CBOT is not a subject of the motion for a finding of contempt, the Debtors initially made the CBOT a party to this proceeding, apparently because of the request for the temporary restraining order sought against it. The Debtors contend that the CBOT will have nothing to determine were the Court to find that the Members have violated the stay and their claims before the Board thus void. Tr. 35:14–22. The Board, however, has an interest in the threshold determination of whether the automatic stay applies. Furthermore, since we hold that the stay does apply and the claims not void, the CBOT also has an interest in the determination of whether it has primary jurisdiction to administer its rules.

the amount so voided preserved for the Inc. estate.

The Court on October 5, 1990 afforded the parties an opportunity to brief, *inter alia:*

> whether a membership in the [CBOT] or gross proceeds of sale thereof, *i.e.*, proceeds prior to the satisfaction of claims allowed under Rule 252, constitute property of the estate under section 541(a)(c)(1) of the Bankruptcy Code, notwithstanding that portion of . . . *Johnson* . . . which construed section 70a of the former Bankruptcy Act and which the parties assert establishes that only the net proceeds constitute property of the estate?

So prompted, the Debtors have changed the theory upon which they seek relief. They now principally argue, joined by the Equityholders' Committee of Group, that *Johnson* established that the membership, and not simply the net proceeds thereof, is property of the estate, over which the bankruptcy court has jurisdiction, notwithstanding claims assertable under the CBOT rules. Supp. Memo., pp. 2–5, 7. They add that since section 541 of the Code is broader than section 70a, the rationale of *Johnson* applies *a fortiori*. Supp. Memo., pp. 5–6.

To the Debtors' contentions, the CBOT and the Members have steadfastly maintained that the automatic stay does not apply. They argue that under the federal regulatory scheme established by the Commodity Exchange Act and the supervisory power of the Commodity Futures Trading Commission, the CBOT has jurisdiction in the first instance to enforce its rules, on notice to all interested parties, including the determination of all claims against the proceeds from the sale of a membership.

CBOT Memo., p. 6; Cross–Motion ¶ 9; Members' Memo., pp. 2–3. This is so, they argue, because under *Johnson*, and its progeny, there is no interest of Inc. over which this Court has jurisdiction until the Rule 252 process has concluded and this Court cannot substitute its judgment for and must defer to the expertise of the Board. CBOT Memo. p. 6; Cross–Motion ¶ 12. The Members add that *Johnson* and similar cases constitute an approval of the entire CBOT claims procedure and that a member who follows the procedure does not violate the stay, regardless of the determination as to the validity of his claim. Members' Memo. pp. 2–3. By having conceded that the Board may proceed with the Rule 252 claims process, and seeking this Court's intervention on the eve of decision by the CBOT only because it fears that the Board may violate its own process or rule against it, CBOT Memo. pp. 2, 4–5; CBOT Supp. Memo. pp. 1–2, the Debtors would have this Court usurp the Board's powers and thus abuse the judicial process. Tr. 26:3–7; Members' Memo. p. 4.

Addressing the statute squarely, the Members argue that sections 362(a)(1), (3) and (6) do not apply. Section 362(a)(1), they argue, does not apply because it bars only proceedings that could have been commenced prior to the filing for bankruptcy, and under the CBOT rules, claims of members may only be filed with the CBOT for a two week period following posting of a notice of sale. Members' Memo. p. 5. The Members believe sections 362(a)(3) and (6) inapplicable because the Debtors erroneously presume that the entire Proceeds belong to the Inc. estate. *Id.*[4]

(ii)

The Members have also cross-moved for relief from the stay, *nunc pro tunc*, if

---

**4.** The Members assert that were they found in violation of the automatic stay, they should not be deemed contemnors because not all violations constitute contempt. Here, when due consideration is given to the underlying facts, and the Members' respect for the jurisdiction and integrity of the Court, their acts are not contemptuous. Members' Memo, p. 6. They also question the Court's jurisdiction to enter a finding of contempt. *Id.* at 7 n. 2.

To the request for a finding of contempt, the CBOT argues that the Debtors cannot now seek relief. Having "actively litigated" before the CBOT for five months and only now bringing a motion, the Debtors are barred by laches. CBOT Memo. pp. 2–3. A finding of contempt would, moreover, chill members from appearing before the CBOT on claims properly and concededly assertable against proceeds of sale of memberships. CBOT Memo. p. 8.

applicable, for cause. The cause they cite is the Board's "unique expertise in interpreting its own rules and public interest in uniformity of application of those rules...." Cross Motion ¶ 14. The CBOT similarly urges that if jurisdiction is found to lie concurrently in the Board and this Court, the administrative law doctrines of primary jurisdiction and exhaustion of administrative remedies requires deferring issues to the administrative agency with unique expertise over the issues in question. *See* Supp. Memo. pp. 4–5. It is claimed that the interpretation of "Members' Contract" requires expertise which this Court does not possess. CBOT Supp. Memo. pp. 6–7. The instant case, it is argued, is unlike those cases in which court have previously retained jurisdiction to decide issues which did not require specialized expertise such as validity of maritime liens and breach of contract issues. *Id.* at 5–6.

No prejudice to the Debtors or interference with the reorganization, the Members assert, will result from an initial CBOT determination. Cross-motion ¶ 15. The CBOT elaborates that because the Debtors may even approve of the CBOT's decision, the motion is premature. CBOT Memo. p. 3; CBOT Supp. Memo. pp. 8–9. Even were the Board to render an adverse ruling, Inc., it is argued, could appeal such a decision to the Commodities Futures Trading Commission ("CFTC"), or by "appropriate court proceeding." CBOT Supp. Memo. p. 9; Second Supp. Memo., pp. 6–7. It is also asserted that since Group is not a party to, and cannot be bound by, the CBOT proceedings, collateral estoppel is of limited offensive use. CBOT Supp. Memo. p. 9.

In response to the cross-motion, the Debtors argue that no cause exists to lift the stay. They urge that relief is warrant-ed only in the most extraordinary circumstances and that no such circumstances exist here. The Debtors now argue that since memberships are property of the estate, the bankruptcy court has jurisdiction to determine issues related thereto. Supp. Memo., p. 7.[5] They also contend that the Court should not defer to the Board because the bankruptcy court, not the CBOT, possesses the expertise necessary to determine the piercing arguments. Response ¶¶ 18–19.

The Debtors express concerns, shared by the Group Creditors' Committee and the Inc. Creditors' Committee, that were the CBOT to determine the validity of the Members' claims against Group, the CBOT, rather than the Court, would determine what is essentially a substantive consolidation issue which is core to any reorganization case. A determination of this issue by the CBOT, it is asserted, could have a significant detrimental impact on the estates of the Debtors and other affiliated debtors and undermine this Court's exclusive jurisdiction over the reorganization process. Motion ¶ 29; Response ¶¶ 20–21. The Debtors complain of a lack of any meaningful administrative review and suggest that the bankruptcy court may review decisions of the CBOT. Supp. Memo., pp. 8–11. It is urged that the committees in the Inc. and Group cases need the opportunity to participate in any hearing on the issue. Tr. 60:14–20. While the committees would deny that an initial CBOT determination would collaterally estop them or Group from litigating in this Court, collateral estoppel arguments could be made. Tr. 62:3–64:6.[6]

II

The principal issues to be decided are: (i) whether a membership in the CBOT is

---

**5.** They had initially argued that though *Johnson* allows the CBOT to determine claims notwithstanding the pendency of Inc.'s chapter 11 case, Response ¶ 11, nothing in *Johnson* impairs this Court's jurisdiction to determine claims prior to completion of the Rule 252 process, including adjudging whether to pierce the corporate veil or whether the Members' claims fall within the field legitimately covered by the scope of the CBOT's business. Response ¶¶ 16–17.

**6.** The Group Creditors' Committee also argues that if the stay is found inapplicable, the Court should stay the CBOT proceedings under section 105(a) of the Code to protect its jurisdiction, for largely the same reasons the Debtors and the committees urge retention of jurisdiction were the stay found applicable. We do not reach the section 105(a) arguments because we find the automatic stay applicable.

property of the estate protected by the automatic stay, notwithstanding CBOT Rules which restrict transfer to the exchange sponsored marketplace and require satisfaction of claims assertable under CBOT Rule 252; and (ii) if so, whether the bankruptcy court may defer to the CBOT determination of the validity and amount of claims allowable under CBOT Rule 252, if such determination would involve issues of substantive consolidation and contractual liability of a debtor.

### A

### (i)

In the landmark *Johnson* case, the Supreme Court reversed the Seventh Circuit's affirmance of the district court's order authorizing the trustee to sell a bankrupt's membership in the CBOT free of asserted members' claims and for the benefit of general creditors. In so ruling, the Supreme Court considered the CBOT's contention that such a membership did not constitute property of a bankrupt's estate under section 70(a)(5) of the former Bankruptcy Act, 11 U.S.C. §§ 1 *et seq.* (1988) (as amended) (repealed), because under state law, it could not be acquired without the approval of the directors of the Board and was not subject to payments of debts of the member by legal proceedings. Section 70(a)(5) provided that the trustee in bankruptcy took title of the bankrupt as of the date of the filing to "property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him." 11 U.S.C. § 110(a)(5) (repealed).

The Supreme Court rejected the CBOT's contention. The Court had ruled on the issue in *Page v. Edmunds*, 187 U.S. 596, 23 S.Ct. 200, 47 L.Ed. 318 (1902), with respect to a membership in the Philadelphia stock exchange. There, a member could not sell the membership if he had unsettled claims, and in case of insolvency, the seat could be sold and proceeds distributed to member creditors.[7] Though the Philadelphia state courts had ruled, as the Illinois state courts in *Johnson* had ruled, that a membership was not property and could not be seized in the execution for the debts of the member, the *Page* Court held that the power of the bankrupt to transfer the seat by any means was sufficient to vest the seat in his trustee. The definition of property under section 70(a)(5) was not to be limited by state law notions of seizure and execution.[8] The *Johnson* Court added that because Congress contemplated a federal bankruptcy policy requiring a broader construction of the statute than the state decisions would give it, the federal courts were not bound by them. 264 U.S. at 10, 44 S.Ct. at 234.

Consistent with this broad notion of property under the bankruptcy law, the Court held for purposes of determining whether the district court sitting as a bankruptcy court had summary, rather than plenary, jurisdiction, that the bankrupt had possession of the membership. The court reasoned that the Board maintains and holds, as the member's trustee, the membership for the use and enjoyment of the member who is in possession. That creditor members could assert a mere restraint of alienation to enforce their claims did not oust the member's possession or personal enjoyment. The Court stated:

> By operation of the bankruptcy law, the membership passes, *subject to rules of the Exchange,* to the trustee, for his disposition of it.... The membership is property, in a way attached to the person of the bankrupt and disposable only by his will. It follows him, therefore, into the bankruptcy court, which is given full

---

7. The *Johnson* Court found irrelevant the rules in *Page* which specifically provided for a sale. No sale was sought by the members or the Board in *Johnson*. In either case, the intent was to prevent transfer so long as a member's obligation to other members was unperformed. 264 U.S. at 10–11, 44 S.Ct. at 234–235.

8. The Supreme Court in *Johnson* further opined that by a construction not unduly strained, section 70(a)(3) which provided that the trustee took title to "powers [the bankrupt] might have exercised for his own benefit, but not those which he might have exercised for some other person," 11 U.S.C. § 110(a)(3) (repealed), could be held to include a power to transfer a seat on the exchange, subject to its rules.

equitable jurisdiction over his conduct in respect of his estate, and therefore, it comes into the custody of that court to be administered by it as part of his estate.

264 U.S. at 12, 44 S.Ct. at 235 (emphasis added).

In conditioning passage of the membership to the estate on the rules of the CBOT, the Court did not intend that the estate acquire an interest in only the net proceeds of sale, *i.e.*, after satisfaction of members' claims. Rather, the membership constituted property of the estate, limited by notions expressed in *Hyde v. Woods,* 94 U.S. 523, 24 L.Ed. 264 (1877). The *Johnson* Court understood *Hyde* to hold that a membership in the San Francisco Stock and Exchange Board, sale of which was subject to election by directors of the board of the vendee as a member, was "an incorporeal right and property which would pass to the trustee of the bankruptcy, subject to the rules of the board, which first required the payment of all debts due to the members." 264 U.S. at 9, 44 S.Ct. at 233.[9] At issue there was whether the pre-bankruptcy application of proceeds of sale of the seat of the delinquent bankrupt constituted an unlawful preference. The Court stated:

A seat in this board is not a matter of absolute purchase. Though we have said it is property, it is incumbered with conditions when purchased, without which it could not be obtained. It never was free from the conditions of [priority of payment of members' claims], neither when ... bought, nor at any time before or since. That rule entered into and became an incident of the property when it was created, and remains a part of it into whose hands soever it may come. As creators of this right—this property—took nothing from any man's creditors when they created it, no wrong was done to any creditor by the imposition of this condition.

94 U.S. at 525. The *Hyde* Court thus concluded that since the membership, if not sold prior to the bankruptcy, would have passed to the bankruptcy estate subject to the priorities of members' claims, the same rule could be imposed on proceeds of the membership without violating any principle of public policy, including the preference laws.

*Johnson,* therefore, established that, under the Act, though subject to claims of members, a membership in the CBOT, and not only the net proceeds after satisfaction of members' claims, was property of the estate over which the bankruptcy court had jurisdiction, by virtue of the bankrupt's right, albeit limited by exchange rules, to transfer the property and because of the bankrupt's possession of the property.[10]

---

**9.** That holding was reaffirmed in respect of seats in the New York and Philadelphia stock exchanges which were subject to the same restrictions on transfer in *Sparhawk v. Yerkes,* 142 U.S. 1, 12 S.Ct. 104, 35 L.Ed. 915 (1891).

**10.** *See also Kohn v. Myers,* 266 F.2d 353, 355 (2d Cir.1959) (bankruptcy court has summary jurisdiction over property in actual or constructive possession of bankrupt at the time petition is filed, citing *Johnson* ); *Seattle Curb Exchange v. Knight,* 59 F.2d 39, 40 (9th Cir.1932) (affirming order of the referee and the district court requiring turnover of proceeds of membership distributed because a corporation could not, under the exchange's rules, be a member of exchange, and bylaws of exchange was not intended to cover contracts of employment between members, the Ninth Circuit stated "the bankruptcy court had constructive possession of the membership and jurisdiction thereof and to determine the claims of the Seattle Stock Exchange with reference thereto"); *In re Frigitemp,* 8 B.R. 284, 288 (S.D.N.Y.1981) (bankruptcy court has summary jurisdiction to resolve dispute over property in trustee's possession, citing *Johnson* ); *Cavanagh Communities Corp. v. New York Stock Exchange,* 422 F.Supp. 382, 387 (S.D.N.Y.1976) (individual membership on a commodity exchange was held property of the bankruptcy estate under the Act); *In re Jefferson Homes,* 40 F.Supp. 519, 521 (E.D.N.Y.1941) (citing *Johnson* for proposition that constructive possession of condemnation award vests district court sitting in bankruptcy with jurisdiction); *In re Yale Express System Inc.,* 11 B.R. 495, 500 (Bankr.S.D.N.Y.1981) (citing *Johnson,* bankruptcy court's summary jurisdiction is limited to proceedings involving claims to property in actual possession of the court); *but see White v. Board of Trade of City of Chicago,* 492 F.2d 871, 874 (7th Cir.1974) (claims arising from transactions on the exchange must be satisfied before the trustee can realize anything on the transfer for the general estate and balance of proceeds is property of the estate). At issue in *White,* however, was whether transactions with fellow members which did not occur on the exchange were proper claims under the exchange rules.

(ii)

■ *A fortiori*, under the Code's broader definition of property of the estate, a membership passes, albeit subject to members' claims, to the estate. Under the Code, property of the estate is comprised of, with exception not relevant here, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The scope of section 541(a)(1) is broad. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). The House and Senate Reports indicate that the scope includes "all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6), and all other forms of property currently specified in section 70a of the Bankruptcy Act[ )]...." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 367 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 82 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5868, 6323.

■ Under the Act, the trustee was vested with certain enumerated property, the most significant of which was contained in section 70(a)(5). This focus on transferability, as defined by state law, the leading treatise opines, caused the Supreme Court to draw the fine lines it did in *Hyde* and *Page*, 4 L. King, R. D'Agostino, M. Cook, R. Mabey, A. Pedlar, H. Sommer & B. Zaretsky, *Collier on Bankruptcy* ¶ 541.02[1] (15th ed. 1990), and hold that a membership passed to the estate because the debtor could by some means, *i.e.,* by paying off his debts to other members or the Board, have transferred the membership. Transferability and state law, however, is no longer the focus:

> The bill [that became the Bankruptcy Code] makes significant changes in what constitutes property of the estate. Current law is a complicated melange of references to State law and does little to further the bankruptcy policy of distribution of the debtor's property to his credi-

tors in satisfaction of his debts.... The bill determines what is property of the estate by a simple reference to what interests in property the debtor has at the commencement of the case. This includes all interests, such as interests in real or personal property, tangible and intangible property, choses in action, causes of action, rights such as copyrights, trademarks, patents, and processes, contingent interests and future interests, whether or not transferable by the debtor....

H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76, 368 (1977), 6136, 6324. Nonbankruptcy law must now be resorted to only to the extent necessary to determine whether the debtor has any legal or equitable interest in the particular item. *See* 4 *Collier* ¶ 541.02[1].

This shift in focus is punctuated by the addition of section 541(c)(1)(A) which provides, with exception not relevant here, that:

> an interest of the debtor on property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law ... that restricts or conditions transfer of such interest by the debtor.

11 U.S.C. § 541(c)(1)(A). This section was intended to invalidate all restrictions on the transfer of property of the debtor, in order that all the interests of the debtor will become property of the estate. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 83 (1978). It further emphasizes the increased independence of the Code from nonbankruptcy law concerning property of the estate, a distinct change from the Act. *See* 4 *Collier* ¶ 541.22.

■ This is not to say, however, that under the Code such restrictions on transfer under state law are without effect. Consistent with *Johnson,* under section

---

The court there did not focus on the issue of whether the membership is estate property. Moreover, the position of the Seventh Circuit on the latter issue was stated more clearly in *Chica-* go *Merc. Exch. v. United States and GNP Commodities Inc.,* 840 F.2d 1352 (7th Cir.1988), discussed *infra.*

363(f), sales of estate property free and clear of interests are permitted, *inter alia,* to the extent applicable nonbankruptcy law so permits. *See* 11 U.S.C. § 363(f). Thus, the CBOT's contention, in reliance on 124 Cong.Rec. 11099 (daily ed., Sept. 28, 1978) (Cong. D. Edwards); 124 Cong.Rec. 17416 (daily ed., Oct. 6, 1978) (Sen. DeConcini), that section 363(f) codifies *Johnson,* Second Supp.Memo., p. 4, supports our holding that a membership is property of the estate and can be sold only if claims under Rule 252 are first satisfied from the proceeds of sale.

Thus under the Code, that transfer of a membership in the CBOT must be effected in accordance with an exchange sponsored marketplace or is subject to payment of claims assertable under the Board rules will not preclude the membership from becoming property of the estate, so long as the debtor had a legal or equitable interest in the membership as of the petition date. At a minimum, a debtor member has a possessory interest in a membership in the CBOT under *Johnson.* Moreover, despite any lack of equity in the membership, the debtor retains a cognizable legal interest therein. A membership, in this light, is no different from a mortgage. It is beyond cavil that in bankruptcy, the estate acquires only those rights which the debtor had as of the petition date and property encumbered prior to bankruptcy would be so encumbered in bankruptcy.[11] Mortgages created pre-petition in accordance with applicable state law continue to encumber the collateral in the hands of the trustee. Though the debtor may not have equity in

the collateral, he has a legal interest therein, and it passes to the estate, protected by the stay and reachable only upon modification of the stay. Similarly, a membership in the CBOT would pass to the estate, encumbered by claims created pre-petition in accordance with Board rules, even if the debtor lacked any equity therein, for he retains legal title. Indeed, the *Johnson* Court, discussing the *Hyde* Court's rejection of the notion that pre-petition satisfaction of claims are preferential, likened members' claims to liens. It stated that "[t]he lien, if it can be called such, is inherent in the property in its creation, and it can be asserted at any time before actual transfer. Indeed the danger of bankruptcy of the member is perhaps the chief reason and a legitimate one for creating the lien." 264 U.S. at 15, 44 S.Ct. at 236.[12]

The CBOT's reliance on *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), for the proposition that state law must be applied to determine the debtor's interest in post-petition rents, Second Supp.Memo., pp. 4–5, hardly commands a different result. To be sure, that portion of *Butner* upholding the validity of security interests created under state law in proceeds of estate property was codified in section 552(b) of the Code. *See* 11 U.S.C. § 552(b). We do no violence to *Butner* or section 552(b), however, when we recognize the liens in accordance with state law, but nonetheless hold that the membership is estate property because under state law, the debtor has a legal interest therein.

**11.** H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 367–68 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 82–83 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5868, 6323 (section 541 "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case"); 124 Cong. Rec. S 17,413 (Oct. 6, 1978) ("to the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate" with exception not relevant here); cf. *Hyde,* 94 U.S. at 525.

**12.** In addition, when determining whether plenary or summary jurisdiction was proper, the *Johnson* Court stated "[i]f the bankrupt was in possession when the petition in bankruptcy was filed, then the authorities leave no doubt that

the possession passes to the trustee and that his possession passes to the trustee and that his possession justifies the District Court in determining the validity of the *liens* claimed in a summary proceeding." 264 U.S. at 11, 44 S.Ct. at 234 (emphasis added).

Authority for the conclusion that the membership passes to the estate might also be found under the Code's counterpart to section 70(a)(3) of the Act. Section 541(b)(1) excludes from property of the estate powers the debtor could exercise solely for the benefit of an entity other than the debtor. Section 541(a) would therefore apparently include those rights which the debtor could exercise for his own benefit under the Board rules.

We are also unpersuaded by the CBOT's assertion that *In re Sorkin*, No. 86B–1905, slip op. (Bankr.N.S.Ill., Nov. 26, 1986), *aff'd*, No. 87C–2373 (N.D.Ill. March 16, 1988), commands a holding that under the Code, the estate's interest is limited to net proceeds. CBOT Supp. Memo., pp. 3–4; Second Supp. Memo., pp. 1–2. There, the bankruptcy court authorized sale of the debtor's interests in CBOT memberships. A lien creditor and the Internal Revenue Service asserted a judgment lien and a tax lien, respectively, with the CBOT and the bankruptcy court against the proceeds held by the Board. The Board disallowed those claims, reasoning that claims assertable under the Board rules had priority under the *Hyde* and *Johnson* cases. Addressing the trustee's request to distribute the proceeds in accordance with the CBOT's determination, the *Sorkin* Court held that members' claims, as determined by the CBOT, had priority over those of non-members since "a trustee in bankruptcy has an interest only in the proceeds which a transfer of a membership generates according to board rules" and "the debtor and his trustee have no property rights in the proceeds until after member creditor claims are satisfied." Slip op. at 12, 13. To the extent that *Sorkin* can be read to hold that only net proceeds are estate property, it contravenes *Johnson* and section 541(a)(6). Furthermore, such a reading of *Sorkin* is internally inconsistent because an order authorizing the sale of memberships implicitly recognizes that the membership and proceeds thereof, *see* 11 U.S.C. § 541(a)(6), is estate property, as noted above.

We are similarly unpersuaded by the CBOT's reading of *Chicago Merc. Exch. v. United States and GNP Commodities Inc.*, 840 F.2d 1352, 1356 (7th Cir.1988), Second Supp. Memo., pp. 2–4. There, the Seventh Circuit held that the Internal Revenue Service did not have valid liens against proceeds of sale of a seat on the Chicago Mercantile Exchange until exchange related claims were satisfied since *Hyde* and *Johnson* established that in bankruptcy cases, the membership passes, subject to the rules of the exchange, to the trustee. *Chicago Merc.*, however, was not a bankruptcy case and whether the membership itself was property of the estate was not at issue.

(iii)

We therefore conclude that the membership sold after Inc.'s filing and proceeds thereof, *see* 11 U.S.C. § 541(a)(6), and proceeds of the nine memberships sold prior to Inc.'s filing [13] are property of the estate protected by the stay as provided in section 362(a).

Initially, the Debtors did not seek a determination that any of the ten claimants have violated the stay under sections 362(a)(1), (3), or (6), by virtue of the memberships and full proceeds thereof constituting property of the estate. Tr. 6, 7, 10–12, 55–57. Having initially conceded that *Johnson* stands for the proposition that only net proceeds are property of the estate, the Debtors failed to advance any theory upon which this Court may found a determination that the automatic stay has been violated. The Debtors narrowly argued that pursuit of only those claims of the Members which are actually claims against Group violated the stay. These arguments were too simplistic. As counsel for the Members pointed out, Tr. 38:19–25, the Debtors ignored that the Members may have independent, direct, and provable claims against Inc. under various theories articulated by them. The Debtors failed to recognize, for example, that while Group may be the issuer of the preferred stock, Papastefan and Rabb may never have

---

13. No contention is made that, for the memberships sold prior to Inc.'s filing, notwithstanding any lack of equity, Inc.'s legal interest in the Proceeds thereof differs from the legal interest it held in the memberships.

Under the Act, if some or all of assertable claims were satisfied from the sale proceeds prior to bankruptcy, then only the balance would pass to the estate. *See Hyde*, 94 U.S. 523.

It would also appear that any such pre-petition payments would not be recoverable as preferences under the Code since they would not have enabled the recipient to receive more than he would have received in a liquidation. *See* 11 U.S.C. § 547(b)(5). We do not reach such issues as no distributions have apparently been made from proceeds of the memberships sold prior to the Members' filings.

agreed to accept such securities as salary compensation and may be entitled to payment directly from Inc. as employer for their services. Similarly, the claims of Benjamin and Karmin are ostensibly against Group. The allegation that pursuit of these claims is not against a member of the CBOT, however, ignored that the Debtors had conceded that claims against members may proceed, notwithstanding bankruptcy. Were the Members to prove that Inc. and Group were one entity, that single entity would have been a member of the exchange, and no violation of the stay would occur, given the concession. Since the previously asserted violations of 362(a)(1), (3), (6) were erroneously premised on the notions that the claims were against Group and that a member could pursue claims against Inc. without violating the stay, the allegations were without merit.

■■ Now asserting that the membership are property of the estate subject to the stay, the Debtors seek an adjudication that the Members are in contempt for having prosecuted claims against Group. Again this ignores that though ostensibly against Group, the Members sought to establish the independent liability of Inc. Thus it is Inc.'s May 29, 1990 petition date, not Group's February 13, 1990 petition date, that applies. The acts occurring after May 29, 1990 violated the automatic stay by continuing a proceeding that was commenced prior to that date or to recover a claim that arose pre-petition, 11 U.S.C. § 362(a)(1); by taking an act to exercise control over the Proceeds, 11 U.S.C. § 362(a)(3); and taking an act to collect, assess or recover a pre-petition claim, 11 U.S.C. § 362(a)(6). While these acts may technically be in violation of the stay, the Debtors do not focus on whether these acts are void. They have instead focused on the propriety of a contempt finding. Only at the hearing of September 27, 1990 did they first intimate a desire to have the claims, not the acts, of the Members declared void. We decline to address whether the acts are void given that the gravamen of the Debtors' complaint is the existence of the claims and not the effect of the Members' acts.[14] As to the voiding of the claims, such a determination would be wholly unjustified. Under CBOT Rule 252, the Members had claims against the memberships or proceeds thereof absent bankruptcy. Moreover, they perfected those interests by filing claims against the Proceeds with the CBOT prior to Inc.'s petition date. There is simply no reason that we should hold the claims themselves void by virtue of the post-petition acts.[15]

■■ A determination that the Members are in contempt for having violated the stay against Inc. would be entirely inappropriate. To be sure, the Second Circuit has indicated that violations of the stay, even based on a good faith argument and belief that there is no violation, are not to be taken lightly. In *In re Crysen/Montenay Energy Co. (Crysen/Montenay Energy Co. v. Esselen Associates)*, 902 F.2d 1098, 1105 (2d Cir.1990), the Second Circuit recently held that

any deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages. An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h). This standard encourages would-be violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estate from incurring potentially

---

**14.** Even were the acts void, since we conclude, *infra* at Part II–B (ii), that the issue of whether the claims fall within the purview of the CBOT Rules is to be deferred to the CBOT, and there is no indication that the CBOT would not allow the Members the opportunity to refile their responses and the responses should, in the interest of economy, stand.

**15.** Even were we to hold that the Members violated the Group stay, by pursuing claims against Group, such that the Group petition date applies, after which date the Members filed their claims, the Debtors have failed to explain why the filings of the claims in April with the CBOT are not exempt under 11 U.S.C. §§ 362(b)(3), 546(b), as acts to perfect interests within the time provided by CBOT Rule 249.-01(e)(i).

unnecessary legal expenses in prosecuting stay violations.

*Id.* at 1105. This is not a case where a debtor gave the creditor numerous admonitions that its acts were violative of the stay, and the creditor failed to seek a declaratory judgment and simply proceeded to prosecute its claims. Here, the Members filed their claims and amendments thereof prior to Inc.'s filing. The Debtors conceded that the membership was not estate property and claims of members against Inc. could be asserted against the Proceeds without violating the automatic stay. Only after these concessions by the Debtors did the Members file additional responses. The Second Circuit certainly could not have intended to fault creditors in cases such as this where Inc. repeatedly assured the Members that it did not consider assertion of members' claims against the Proceeds violative of the stay and our decision turns on that issue. The Members' failure to seek a declaratory judgment with respect to that issue is attributable to the conduct of the Debtors. Nor can it be said, given the Debtors' position throughout the CBOT proceedings and this proceeding, until questioned by the Court, that the Members' failure to petition caused the Debtors to incur unnecessary legal expenses.[16]

### B

#### (i)

■■■■■ Having found the automatic stay applicable, we turn to the cross-motion. Since a membership on the CBOT and proceeds thereof are property of the estate, the district court has exclusive jurisdiction, under 28 U.S.C. § 1334, over such property, which jurisdiction is referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a) and the Standing Order of Referral of Cases to Bankruptcy Judges dated July 10, 1984 (Ward, Acting C.J.). The bankruptcy court may determine the liquidation of claims against proceeds of such property, having authority to hear and determine core matters including, in chapter 11, the liquidation of claims other than personal injury or wrongful death claims, against property of the estate. 28 U.S.C. § 157(b)(2)(B). Exclusive jurisdiction would also extend to determining substantive consolidation issues which involve the defining of the property of the estate of related debtors since they affect "the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship." 28 U.S.C. §§ 157(b)(2)(O). It would appear, however, that absent bankruptcy, the CBOT would have exclusive jurisdiction to determine the validity and amount of claims asserted under the Board rules in the first instance, even if such a determination entailed resolution of such issues as alter ego and piercing the corporate veil. *See* CBOT Rule 252(a)–(d).[17]

The cases indicate that the bankruptcy court has jurisdiction to liquidate claims in light of this conflict. Indeed, in *Johnson,* the Supreme Court sustained the bankruptcy court's jurisdiction to make the initial determination as to the validity of members' claims, 264 U.S. at 12, 44 S.Ct. at 235, albeit overturned on the merits. In addi-

---

**16.** The *Crysen/Montenay* Court also stated that "the enactment of [section 362(h) in 1988] granted bankruptcy courts an independent statutory basis, apart from their contempt powers, to order sanctions against violators of automatic stays." 902 F.2d at 1104. We need not address the arguments of the Members and the CBOT raising laches and any chilling effect in light of our conclusion.

**17.** Because the bankruptcy court has jurisdiction over property of the estate, the principle of exhaustion of administrative remedies is not applicable. That doctrine provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted," and most commonly applies where relevant statute provides that the administrative procedures shall be exclusive. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1968). It concerns a court's requirement that a party exhaust all remedies available to it before it takes jurisdiction to review the agency's action, not determine the dispute or issue in the first instance. *United States v. Western Pac. R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956); R.J. Pierce, S.A. Shapiro & P.A. Verkuil, *Administrative Law & Process* 190 (1985). *Westheimer v. Commodity Exchange,* 651 F.Supp. 364 (S.D.N.Y.1987), relied upon by the CBOT, CBOT Supp. Memo. pp. 7–8, is therefore not applicable.

tion to making the statements cited *supra* in Part II–A(i), the *Johnson* Court cited with approbation *O'Dell v. Boyden*, 150 F. 731 (6th Cir.1906) for the proposition that "[a] membership [in the New York Stock Exchange] passe[s] into possession of the trustee as assets of the estate and that, being thus in custody of the court, the claim of one to whom the owner of the seat had previously made an assignment of it to secure a debt, [is] to be settled in a summary proceeding in the bankruptcy court," 264 U.S. at 13, 44 S.Ct. at 235. Further

> [o]nly by decree in personam compelling the bankrupt member can such a transfer of membership be effectuated as will put the buyer in the place of [the bankrupt as a member. Over him for that purpose the bankrupt court has exclusive control and in this sense, also, may it be said that the 'seat' or 'membership' was in custodia legis when the trustee sought the aid of the court to adjudicate the claims and liens asserted by [one to whom the owner of the seat had previously made an assignment to secure a debt].

264 U.S. at 13, 44 S.Ct. at 235, quoting 150 F. at 737.

As noted above, *see* n. 10, in *Seattle Curb Exchange v. Knight*, 59 F.2d 39 (9th Cir.1932), the Ninth Circuit held that because exchange rules were to be limited by the scope and purpose of the field, employment contracts between members were not intended to be covered by the exchange bylaws. In so doing, the court also expressly stated that the bankruptcy court has jurisdiction to determine CBOT claims in the first instance. 59 F.2d at 40. In *White v. Board of Trade of City of Chicago*, 492 F.2d 871, 873 (7th Cir.1974), relied on by the CBOT and the Debtors, the CBOT participated in the referee's determination, affirmed by the district court and the Seventh Circuit, that the CBOT rules do not reach "Members' Contracts" which did not arise on the exchange. The issue of whether the Board or the bankruptcy court has jurisdiction in the first instance, however, was not litigated.

The *Sorkin* Court did defer to the CBOT for determination of claims under the Board rules. That case, however, as noted above, was incorrectly premised on the estate's lack of interest in the membership or proceeds thereof. Any conclusion that the bankruptcy court lacked jurisdiction to determine the claims in the first instance would therefore appear to be erroneous. Again the CBOT's reliance on *Sorkin* is misplaced. CBOT Memo., pp. 5–6; CBOT Supp. Memo., pp. 3–4; Second. Supp. Memo., pp. 1–2.

Not before the courts in any of the cases discussed, *see also* n. 10, however, was whether the bankruptcy court should retain jurisdiction to adjudicate members' claims when the expertise of the Board and the goal of uniformity in enforcing Board rules were asserted, on the one hand, and where substantive consolidation and breach of contract are at issue, on the other. We thus consider the discretionary principle of administrative law of primary jurisdiction. R.J. Pierce, S.A. Shapiro & P.A. Verkuil, *Administrative Law & Process* 206–218 (1985) [hereinafter Pierce, *Admins. Law* ].

(ii)

Primary jurisdiction is a concept used by courts to allocate initial decision making responsibility between agencies and courts where agency and court jurisdiction to resolve disputes and issues overlap. Pierce, *Admins. Law*, at 206. The doctrine "provides that a court with jurisdiction *may* defer resolution of a technical factual issue to an administrative agency having expertise beyond the normal competence of judges in order to preserve consistency and uniformity in regulation of the business entrusted to that agency." *In re McLean Indus.*, 76 B.R. 328, 331, 16 Bankr.Ct.Dec. 420, 17 C.B.C.2d 155 (Bankr.S.D.N.Y.1987) (citing *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952)) (emphasis added). In *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), for example, the doctrine was held not to apply where the petitioner had a common law tort action based on fraudulent misrepresentation for failure to dis-

close overbooking practices since no tariff practice or similar technical question of facts uniquely within the Civil Aeronautics Board's expertise was involved.

In *McLean*, 76 B.R. 328, the Court found instructive in the bankruptcy context, such cases as

*Order of Railway Conductors v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946) (intricate dispute between two unions regarding provision of services to bankrupt railroad should have been deferred by railroad reorganization court to Railway Labor Adjustment Board and court should have stayed proceedings before it pending resolution by the Board), *Smith v. Hoboken R.R. Co.*, 328 U.S. 123, 130, 66 S.Ct. 947, 951–52, 90 L.Ed. 1123 (1946) (issue of whether a bankrupt railroad had forfeited track rights should have been deferred by railroad reorganization court to the Interstate Commerce Commission in view of statute requiring commission certificate for abandonment of tracks), *Nathanson v. National Labor Relations Board*, 344 U.S. 25, 30, 73 S.Ct. 80, 83–84, 97 L.E.D. 23 (1952) (liquidation of unfair labor practice claim should have been deferred by bankruptcy court to the NLRB for it to determine the appropriate remedy), and *Gary Aircraft Corp. v. United States of America (In re Gary Aircraft Corp.)*, 698 F.2d 775 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983) (claims arising from government contract should been deferred by bankruptcy court to Board of Contract Appeals where claims were highly technical and complex).

76 B.R. at 331. In the absence of precedent, whether to defer liquidation of a claim to an agency is within the court's "sound discretion." *Nathanson*, 344 U.S. at 30, 73 S.Ct. at 83–84.

Applying these principles, Judge Buschman has held that: the NLRB must be afforded reasonable time to liquidate an unfair labor practice claim, notwithstanding the debtor's need for speedy confirmation, *In re Mountain View Coach Line, Inc.*, 99 B.R. 555, 19 Bankr.Ct.Dec. 548, Bankr.L.Rep. (CCH) ¶ 72884 (Bankr.S.D.N.Y.1989); the bankruptcy court should defer to the Maritime Subsidy Board or Court of Claims for calculation of "operating differential subsidy" due the debtor by the United States Maritime Administration, but not on issues in the dispute relating to breach of contract, lender liability, turnover, and equitable subordination, *In re Prudential Lines, Inc.*, 79 B.R. 167, 16 Bankr.Ct.Dec. 653 (Bankr.S.D.N.Y.1987); the issue of validity of maritime liens was not to be deferred to admiralty court where debtor's challenge to it was grounded in debtor's status as debtor in possession under section 544(a), *McLean Indus.*, 76 B.R. 328; and the bankruptcy court was not to defer issue of adequacy of creditors' committees' representation of creditors since no special expertise or administration was required, *In re McLean Industries, Inc.*, 70 B.R. 852, 15 Bankr.Ct.Dec. 864, Bankr.L.Rep. (CCH) ¶ 71745, 16 C.B.C.2d 645 (Bankr.S.D.N.Y.1987). *Cf. In re Prudential Lines, Inc.*, 69 B.R. 439, 15 Bankr.Ct.Dec. 445, Bankr.L.Rep. (CCH) ¶ 71676, 16 C.B.C.2d 383 (Bankr.S.D.N.Y.1987) (section 362(b)(12) permits the admiralty court, in light of its specialized nature and expertise to rank maritime liens, hold a sale of vessel, and distribute the proceeds to maritime lien claimants and the holders of valid ship mortgages and security interests).

 To be sure, exchanges, though under a duty to comply with their constitutions and rules filed with the appropriate administrative agency, *see* 7 U.S.C. § 7, have a substantial degree of power to interpret their own rules. *See Fogel v. Chestnutt*, 533 F.2d 731, 753 (2d Cir.1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976). At issue in the case at bar, however, is the scope of the CBOT's expertise and business entrusted to it.[18]

18. Although we are not here concerned with an administrative agency to which Congress entrusted the matter, *see Nathanson*, 344 U.S. at 30, 73 S.Ct. at 83–84; *Far East Conf.*, 342 U.S. at 574, 72 S.Ct. at 494; *Pitney*, 326 U.S. at 565, 66 S.Ct. at 324; *Gary Aircraft*, 698 F.2d at 784, we deal with a quasi-administrative agency to be self-regulated and recognized as a contract mar-

Whether a claim arises out of a Members' Contract exclusive of personal debts unrelated the conduct of business as a broker, trader or commission merchant, within the meanings of CBOT Rules 252(a)(6), 916.00, and amount thereof, would appear to require the expertise and specialized knowledge of the CBOT, and thus fall within the scope of self-regulation entrusted to it. The resolution of these issues would entail a determination of whether both the claimant and Inc. are members of or entities registered with the CBOT under the Rules and Regulations. The nature of the transaction would also have to be examined. Whether borrowing, loaning, or payment of money occurred "on the floor of the Exchange or elsewhere" would require an understanding of how transactions are effected in the Exchange. The conduct of business of brokers, traders or commission merchants is to be considered. The amount of such a claim is inextricably tied with all these issues. These tasks require more than analyzing legislative history and interpreting statutes which fall within the general competence of judges. *Prudential Lines*, 79 B.R. at 178. While bankruptcy courts would, albeit without great facility, be able to resolve these issues, and have in fact been called upon to do so, *see Johnson*, 264 U.S. 1, 44 S.Ct. 232; *Seattle Curb*, 59 F.2d 39; *White*, 492 F.2d 871, the resolution of these issues requires examination of Board Rules and Regulations and conduct of Exchange business affecting the Board, its members and clearing houses which are not within the general competence of judges. The CBOT, on the other hand, often grapples with these issues, in the context of, *inter alia*, Rule 252, and clearly possesses far greater expertise. These issues are clearly within the business entrusted to the CBOT.

To the extent statute governs what constitute "commodities" and "securities," whether the transaction involved purchase or sale of commodities or purchase, sale, borrowing, loaning, or hypothecation of securities, would appear to fall within the general competence of judges. The district court stated in *Cavanagh Communities Corp. v. New York Stock Exch.*, 422 F.Supp. 382, 386 (S.D.N.Y.1976), however, that "[t]o hold that an administrative agency should continue to exercise dominion over some aspects of a single problem but to deny jurisdiction over others which are integrally related is to fragmentize the authority which Congress intended the agency to have. There is plain merit in having one body, be it court or agency, consider this entire ball of wax." Here, there is plain merit to having the CBOT determine all of the described issues bearing on validity and amount of the Members' claims. The CBOT has an interest in the uniform application of its rules as they affect the Board, its members and clearing houses, and is to be accorded deference with respect to its charge. To fragmentize resolution of issues under CBOT Rules 252, 916.-00 and related rules would subvert that interest. Indeed, the Supreme Court in *Nathanson*, 344 U.S. at 30, 73 S.Ct. at 83–84, stated that "the bankruptcy court normally supervises the liquidation of claims, but the rule is not inexorable.... A sound discretion may indicate that a particular controversy should be remitted to another tribunal for litigation." We think deferring all of the described issues relating to liquidation of the Members' claims are within this Court's sound discretion.[19]

▬ The same, however, cannot be said for the issues relating to employment contracts and of alter ego, piercing the corporate veil, and similar theories which, if

---

ket by the Commodities Exchange Act, and apply the doctrine by analogy.

**19.** Inc., for example, raised defenses before the CBOT on August 2 and Sept. 6 specific to each of the ten individuals who filed claims against the Proceeds, including failure to provide evidence supporting claims for commissions, failure to specify "other damages," lack of standing by virtue of never or not currently being a

member of the CBOT, and untimely filing of claims. Motion. Exs. F, K. These issues appear to fall within the expertise of the CBOT, *see e.g.*, CBOT Rules 249.01(e)(i) (timely filing of claims). To the extent these are open issues with respect to the Members' claims which are the subject of this motion only may the CBOT liquidate the claims in accordance with its Rules.

proven, would establish the contractual liability of a debtor and effect a substantive consolidation of Inc.'s and Group's estates. Absent bankruptcy, the CBOT's jurisdiction may extend to such issues if they bear on the validity and amount of a member's claim. But the CBOT does not truly purport to be an expert in resolving issues of substantive consolidation and contract liability. Nor can it be said that it has an interest in the uniform resolution of such issues. These issues are akin to those of breach of contract, lender liability, turnover, equitable subordination, validity of maritime liens under section 544(a) and adequacy of representation of creditors' committees, the determination of which this Court has found to be in the general competence of judges. *See Prudential Lines,* 79 B.R. 167; *McLean Indus.,* 76 B.R. 328; *McLean Indus.,* 70 B.R. 852. Moreover, the issues of substantive consolidation and existence and breach of employment contracts involves application of substantial principles of bankruptcy, debtor-creditor and contract law with which bankruptcy courts constantly deal. *Id.* We do not view the request that the Court retain these issues as an attempt by the Debtors to "pick and choose" issues or to have this Court usurp the authority of the CBOT. Tr. 27, 57. Unlike determining validity and amount of claims under CBOT Rules in so far as the exchange's business is concerned, the bankruptcy court has an un-

flagging duty to address arguments which, if proven, would effect a substantive consolidation of related estates and establish contractual liability on the part of a debtor.[20]

Were we to defer to the CBOT on whether the claims are within CBOT Rules 252(a)(6), 916.000, and related rules, assuming that the Members are successful in their respective alter ego and employment contract issues, a ruling by the CBOT in favor of Inc. would moot the substantive consolidation and employment contracts issues. Were the CBOT to rule against Inc., the Court would retain jurisdiction to decide the substantive consolidation and contract issues, although stayed pending decision by the CBOT. *See* Pierce, *Admins. Law* 206 (resolution of the dispute is to be stayed pending resolution of an issue deferred to an agency with primary jurisdiction). Appeal of the entire matter could be taken, if necessary, to district court. Such results are preferable to those which would obtain were we to defer the entire dispute as the CBOT would have us do. Not only would the Court thus improperly abstain from substantive consolidation and liquidation of claims issues, Pierce, *Admins. Law* 206, such a course of action might require relitigation, given that the bankruptcy court has exclusive jurisdiction over such issues and the CBOT no expertise or interest therein and the CBOT does not contend that the committees would be

---

**20.** Not the subject of this motion are various claims of the Members or the other six claimants which respect to which Inc. raised, on August 2, 1990, the following defenses: claims relating to employee benefit plans could not be pursued against the Proceeds because such plans are separate legal entities from the sponsoring employer and are not therefore claims against a member of the CBOT; those claims, moreover, were alleged to be governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") and not assertable outside that statutory scheme. Motion Ex. F. To this, Mr. Papastefan responded that severance pay claims could be asserted against the Proceeds, there being no separate legal entity apart from Inc. to satisfy the obligations, and ERISA not pre-empting claims pursuant to CBOT rules as mandated by the Commodity Exchange Act. Motion, Ex. I. Mr. Rabb contended that he never accepted Group stock for employee benefit claims. Mo-

tion, Ex. J. Inc. countered that notwithstanding that no separate legal entity was established to satisfy severance claims, determination of such claims were still pre-empted by ERISA. Motion, Ex. K.

Mr. Benjamin defended in addition to the alter ego argument that Inc. is liable for his claim because Group was Inc.'s agent for purposes of compensating Mr. Benjamin or under the principle of quantum meruit. Motion, Ex. G.

Inc. also disputed on Sept. 6 a claim by a third party beneficiary of an agreement between Inc. and the claimant's assignor. Motion, Ex. K.

Resolution of the foregoing issues would appear to fall within the general competence of the Court, and not requiring the expertise of the CBOT. They are not before the Court, and nothing herein is to be construed to defer jurisdiction to the CBOT on this issues.

granted intervenor status in the CBOT proceedings. *See Gary Aircraft,* 698 F.2d at 784; *Mountain View,* 99 B.R. 561; *Prudential Lines,* 79 B.R. at 179 (important consideration to be weighed is whether issue might have to be tried twice because tribunal without exclusive jurisdiction hears matter first); 11 U.S.C. § 1109(b) (parties in interest have a right to be heard on any issue).[21]

The cases cited by the CBOT do not command a different result. *Cavanagh,* 422 F.Supp. 382, held that the bankruptcy court should have deferred issues dealing with delisting procedures in light of the pervasive and comprehensive statutory authority of the Securities Exchange Commission and an exchange listing not being property of the estate. *Ricci v. Chicago Merc. Exch.,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1972) similarly held that the district court should have stayed the petitioner's antitrust complaint charging conspiracy to restrain his business by transferring to another person the petitioner's Chicago Mercantile Exchange Membership in violation, *inter alia,* of the Exchange rules, pending a determination by the Commodities Exchange Commission as to whether the rules were in fact violated. Although the Commission could not decide whether the Commodity Exchange Act immunized conduct from the anti-trust laws, the Commission's determination of whether the Exchange's rules were violated required a factual determination within its special competence which would aid the antitrust court in arriving at the essential accommodation between the antitrust and regulatory regimes. Here, the CBOT is only a quasi-administrative agency, *see* n. 18, and a membership constitutes property of the estate. We nevertheless defer to the CBOT to administer its rules to the extent it has expertise and an interest in uniformity. Nothing in *Cavanagh* or *Ricci* requires the bankruptcy court to defer substantive consolidation and contractual liability issues in which the CBOT lacks, and the bankruptcy possesses, expertise and an interest in uniform resolution.

The motion is therefore denied in its entirety and the cross-motion is granted only to modify the automatic stay to permit the CBOT to determine, assuming the Members are successful in their respective alter ego or employment contract arguments, whether the Members' claims lie within the purview of CBOT Rules 252(a)(6), 916.00, and related rules as prescribed herein, and if so, to liquidate the claims of the Members which are the subject of this motion, in accordance with the CBOT Rules. Nothing herein, however, authorizes the CBOT to proceed to distribute the Proceeds pursuant to its decision.

Settle an order consistent with this opinion.

**21.** The CBOT argues that appeal could be taken from its decision to the CFTC or a court of competent jurisdiction, citing 7 U.S.C. § 12c and 5 U.S.C. § 701 *et seq.* The Debtors do not believe that the CFTC would grant an appeal under 7 U.S.C. § 12c, because CFTC regulations, 17 C.F.R. §§ 9.1 *et seq.,* limit appeals to review of "any suspension, expulsion, disciplinary, or access denial action, or other adverse action" and excluded from "other adverse action" is any "exchange action that solely involves the internal corporate affairs of the exchange." 17 C.F.R. § 9.2(g). The intent, the Debtors urge, was to limit review to those actions that relate to the exchange's function as a contract maker and exclude those relating to claims against an exchange member's assets since remote from regulatory concerns. 52 Fed.Reg. 25362, 25363 (July 7, 1987). Supp. Memo., pp. 8–10.

It also appears that the CBOT's reliance on *White,* 492 F.2d 871, for the proposition that the bankruptcy court can review the Board's interpretation, is misplaced, Second. Supp. Memo., p. 7. There, the Board participated in the referee's determination which the Board appealed to the district court. The Board did not itself make the initial determination.

We need not, however, resolve these and collateral estoppel issues in light of the court's exclusive jurisdiction over substantive consolidation and contract liability issues and relitigation concerns.